OPINIONS OF THE SUPREME COURT OF OHIO
     The full texts of the opinions of the Supreme Court of
Ohio are being transmitted electronically beginning May 27,
1992, pursuant to a pilot project implemented by Chief Justice
Thomas J. Moyer.
     Please call any errors to the attention of the Reporter's
Office of the Supreme Court of Ohio.  Attention:  Walter S.
Kobalka, Reporter, or Deborah J. Barrett, Administrative
Assistant.  Tel.:  (614) 466-4961; in Ohio 1-800-826-9010.
Your comments on this pilot project are also welcome.
     NOTE:  Corrections may be made by the Supreme Court to the
full texts of the opinions after they have been released
electronically to the public.  The reader is therefore advised
to check the bound volumes of Ohio St.3d published by West
Publishing Company for the final versions of these opinions.
The advance sheets to Ohio St.3d will also contain the volume
and page numbers where the opinions will be found in the bound
volumes of the Ohio Official Reports.

City of Akron, Appellee, v. Rowland, Appellant.
[Cite as Akron v. Rowland (1993),      Ohio St. 3d    .]
Constitutional law -- Akron Codified Ordinance 138.26
     prohibiting loitering for the purpose of engaging in
     drug-related activity violates the federal and Ohio Due
     Process Clauses because it can only be interpreted as
     impermissibly vague or overbroad.
     (No. 92-1120 -- Submitted April 28, 1993 -- Decided
September 22, 1993.)
     Appeal from the Court of Appeals for Summit County, No.
15307.
     Appellant, David Rowland, was convicted in Akron Municipal
Court of violating Akron Codified Ordinance 138.26 ("A.C.O.
138.26"), "Loitering for the Purpose of Engaging in
Drug-Related Activity," a fourth degree misdemeanor.1  The
Ninth District Court of Appeals affirmed his conviction.  In
both courts Rowland challenged the constitutionality of the
ordinance.
     The city of Akron based its case against Rowland on the
testimony of the Akron police officers who participated in
Rowland's arrest.  The officers testified that on the evening
of February 20, 1991, they saw Rowland several times at the
corner of Madison Avenue and Copley Road in Akron.  At that
corner there was a traffic light and a small convenience-type
store.  Rowland, a thirty-two-year-old, unemployed,
African-American male, lived approximately one-half mile from
the corner.
     When the arresting officers first saw Rowland, he was
leaning into the window of a car stopped on Copley Road.  The
officers used their loudspeaker system to ask him not to loiter
in that area.  Rowland then entered the convenience store.
     The second time the officers saw Rowland he was leaning
into the window of a second car stopped on Madison Avenue.  As
the police pulled up next to the car, Rowland walked to the
front of the store.
     On two or three occasions later that evening, the officers
saw Rowland standing in front of the store talking with a group
of people.  The officers learned from a third officer that

Rowland had a prior drug arrest and conviction. According to the officers, every time they were seen by Rowland, he would enter the store.

Finally, at approximately 7:00 p.m., the officers saw Rowland walking away from the corner with another person. The officers pulled up next to Rowland in their car and, on the pretext of having him identify a photograph of a robbery suspect, asked him to approach the police cruiser. Rowland was standing twenty to twenty-five feet from the car and it was very dark outside. Rowland refused to approach the car.

The officers testified that Rowland appeared to hand something to the person he was with and then ran away. One officer chased Rowland. That officer testified that Rowland looked as if he was throwing something to the ground as he was running and putting something into his mouth after he stopped. The officer caught Rowland and arrested him. The police searched Rowland and the area in which he was arrested but did not find any drugs or drug paraphernalia. No evidence that Rowland had actually committed a drug-related offense was introduced by the city at trial.

The municipal court first ruled that A.C.O. 138.26 survived Rowland's constitutional challenge. It then concluded, based on the evidence presented, that Rowland had violated the ordinance by loitering "in a manner and under circumstances manifesting the purpose to engage in drug-related activity[.]" The court based its decision on the existence of five of the criteria set forth in the ordinance, specifically subsections (B)(1), (B)(3), (B)(5), (B)(6) and (B)(9). The court stated its belief that the "combination of all these factors over a period of two hours after dark in the wintertime indicates something other than just standing out for sociability reasons." The court of appeals affirmed.

The cause is now before this court pursuant to the allowance of a motion to certify the record.

Douglas J. Powley, Chief City Prosecutor, Bruce D. Kelley, Assistant City Prosecutor, and Max Rothal, Director of Law, for appellee.

J. Dean Carro and Joseph Kodish, for appellant.

Kevin Francis O'Neill, urging reversal for amicus curiae, American Civil Liberties Union of Ohio Foundation, Inc.

Wright, J.

I

A. History of Loitering Laws

Loitering and vagrancy laws have a long and troubling history in Anglo-American jurisprudence. Vagrancy laws existed in England as early as the seventh century in the form of "poor laws." See Comment, The Third Generation of Loitering Laws Goes to Court: Do Laws That Criminalize "Loitering with the Intent to Sell Drugs" Pass Constitutional Muster? (1993), 71 N.C.L.Rev. 513, 515. Poor laws were instituted for economic reasons: they criminalized the status of unemployment in an attempt to ensure that peasant-class laborers would be unable to leave the employ of their feudal masters for higher paying jobs. Id.; Comment, Is There Something Suspicious About the Constitutionality of Loitering Laws? (1989), 50 Ohio St.L.J.

717, 717-718. Notable among the early poor laws was the Statute of Laborers, which was "designed to stabilize the labor force by prohibiting increases in wages and prohibiting the movement of workers from their home areas in search of improved conditions." Papachristou v. Jacksonville (1972), 405 U.S. 156, 161, 92 S.Ct. 839, 842, 31 L.Ed.2d 110, 115.

When it became apparent that such laws did not effectively control the labor market, they were "redirected to crime prevention." Comment, supra, 71 N.C.L.Rev. at 516. See Papachristou, supra, 405 U.S. at 161-162, 92 S.Ct. at 842-843, 31 L.Ed.2d at 115. In England, vagrancy was criminalized on the theory that people not visibly employed were more likely to commit crimes. Comment, supra, 71 N.C.L.Rev. at 516. This theory and the statutes which embodied it were brought to America from England and were enforced well into the twentieth century. Comment, supra, 50 Ohio St.L.Rev. at 718. "When these laws finally made their way to early America, they did so under 'the theory that society must have a means of removing the idle and undesirable from its midst before their potential for criminal activity is realized.'" Id. (quoting Note, Homelessness in a Modern Urban Setting [1982], 10 Fordham Urb.L.Rev. 749, 756).

In the 1970s and 1980s, however, most American vagrancy laws were held unconstitutional by the United States Supreme Court. The most celebrated vagrancy case decided by the court was Papachristou v. Jacksonville, supra. In Papachristou, the court considered the constitutionality of a Jacksonville ordinance that was "derived from early English law" and employed the same "archaic language." Id. at 161, 92 S.Ct. at 842, 31 L.Ed.2d at 114. The ordinance penalized, among others, "rogues and vagabonds," "dissolute persons who go about begging, common gamblers, persons who use juggling or unlawful games or plays, common drunkards, *** persons wandering or strolling around from place to place without any lawful purpose or object, [and] habitual loafers ***." Id. at 156-157, 92 S.Ct. at 840, 31 L.Ed.2d at 112, fn. 1. Finding the ordinance to be vague, the court unanimously held that enforcement of the ordinance violated the Due Process Clause of the Fourteenth Amendment. Writing for the court, Justice William O. Douglas observed that the "Jacksonville ordinance makes criminal activities which by modern standards are normally innocent." Id. at 163, 92 S.Ct. at 844, 31 L.Ed.2d at 116. Not only were many of the activities innocent but, as Justice Douglas explained, some had been woven into the fabric of American life:

"The difficulty is that these activities are historically part of the amenities of life as we have known them. They are not mentioned in the Constitution or in the Bill of Rights. These unwritten amenities have been in part responsible for giving our people the feeling of independence and self-confidence, the feeling of creativity. These amenities have dignified the right of dissent and have honored the right to be nonconformists and the right to defy submissiveness. They have encouraged lives of high spirits rather than hushed, suffocating silence." Id. at 164, 92 S.Ct. at 844, 31 L.Ed.2d at 117.

The court held that the Jacksonville ordinance was unconstitutionally vague both because it did not give ordinary

people notice of what conduct was prohibited and because it gave the police unfettered discretion to make arrests.

In Kolender v. Lawson (1983), 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903, the Supreme Court reaffirmed the basic principles expounded in Papachristou.  The court declared unconstitutional a California statute that made it illegal for a person to "loiter[] or wander[] upon the streets or from place to place without apparent reason or business and *** refuse[] to identify himself and to account for his presence when requested by any peace officer so to do, if the surrounding circumstances are such as to indicate to a reasonable man that the public safety demands such identification."  Id. at 353, 103 S.Ct. at 1856, 75 L.Ed.2d at 906, fn. 1.  "Our Constitution is designed to maximize individual freedoms within a framework of ordered liberty," the court wrote, and it thus set out to examine the California statute "for substantive authority and content as well as for definiteness or certainty of expression."  Id. at 357, 103 S.Ct. at 1858, 75 L.Ed.2d at 909.

In the court's view, the central problem with the California law was that it vested too much discretion in the hands of the police.  Id. at 358, 103 S.Ct. at 1858, 75 L.Ed.2d at 909.  Under the statute, "[a]n individual, whom [sic] police may think is suspicious but do not have probable cause to believe has committed a crime, is entitled to continue to walk the public streets 'only at the whim of any police officer' who happens to stop that individual ***."  Id. (quoting Shuttlesworth v. Birmingham [1965], 382 U.S. 87, 90, 86 S.Ct. 211, 213, 15 L.Ed.2d 176, 179).  The court concluded that the statute was unconstitutionally vague "because it encourages arbitrary enforcement by failing to describe with sufficient particularity what a suspect must do in order to" commit a violation.  Kolender, supra, at 361, 103 S.Ct. at 1860, 75 L.Ed.2d at 911.

With the demise of the broad vagrancy statute, local governments increasingly turned to loitering laws to achieve the same purposes.  Comment, supra, 71 N.C.L.Rev. at 517.  The new loitering laws were narrower than the vagrancy statutes in that they focused on preventing specific sorts of crime -- first targeting prostitution and then drug crime.  This generation of loitering ordinances, however, sought "to wrap the same unconstitutional law in a prettier package that was more likely to receive judicial sanction."  Id.  A.C.O. 138.26 is just such an ordinance.

### B. Akron Codified Ordinance 138.26

The purpose behind A.C.O. 138.26 was articulated by the ordinance's sponsor, Akron Councilman Michael David Williams. He testified in the municipal court below that, in response to complaints from constituents regarding drug crimes, he intended the ordinance to "assist the Police Department in dealing with the street vendor or individuals who were congregating in large numbers in front of citizen[s'] homes and on corners in neighborhoods in my Ward."

The language of the ordinance, however, goes far beyond the goal stated by Councilman Williams.  Subsection (A) broadly provides:

"No person shall loiter in or near any thoroughfare, place

open to the public, or near any public or private place in a manner and under circumstances manifesting the purpose to engage in drug-related activity contrary to any of the provisions of R.C. Chapter 2925."

Subsection (B) provides a list of eleven circumstances "which may be considered in determining whether such purpose is manifested ***."  The ordinance does not explain how the eleven "circumstances" are to be considered or what weight they are to carry.2  Most notable, nothing in A.C.O. 138.26 requires that a drug crime actually be committed in order to support an arrest or conviction.  A.C.O. 138.26 is clearly a law designed to nip crime "in the bud."  Papachristou, supra, 405 U.S. at 171, 92 S.Ct. at 848, 31 L.Ed.2d at 120.

II
A. Construction of the Ordinance

The courts below found A.C.O. 138.26 constitutional by reading into the ordinance a "specific intent" element.  The court of appeals wrote that "one of the crucial elements of this ordinance is that of specific intent to engage in drug-related activity."  We find that the court of appeals erred in adding a specific intent element to the ordinance.

We are aware of the principle that, if it is reasonably possible, validly enacted legislation must be construed in a manner "which will avoid rather than *** raise serious questions as to its constitutionality."  Co-operative Legislative Commt. of the Transp. Bhds. & Bhd. of Maintenance of Way Emp. v. Pub. Util. Comm. (1964), 177 Ohio St. 101, 29 O.O.2d 266, 202 N.E.2d 699, paragraph two of the syllabus.  At the same time, a court's construction of a legislative enactment must bear some reasonable relation to the language of the enactment.  "[I]t is not the province of the court, under the guise of construction, to ignore the plain terms of a statute or to insert a provision not incorporated therein by the Legislature."  (Emphasis added.)  State ex rel. Defiance Spark Plug Co. v. Brown (1929), 121 Ohio St. 329, 331-332, 168 N.E. 842, 843.

The courts below, in an effort to save A.C.O. 138.26, added an element to the offense that was not incorporated by the Akron City Council.  That element, specific intent, cannot be found in the language of the ordinance.  More significant, a specific intent requirement is irreconcilable with the goal of the ordinance, which is to permit arrest and conviction when an individual is acting under "circumstances manifesting the purpose" to commit a drug crime.  Acting under "circumstances manifesting" a purpose to do something is a far cry from specifically intending to do something.  For example, a carpenter carrying a tool belt and ladder down a dark street late at night may well be manifesting the purpose to burglarize a home.  This evidence, however, certainly does not show that he or she specifically intends to commit burglary.

In A.C.O. 138.26 the Akron City Council clearly demonstrated its intent to permit police to make arrests based on the existence of certain "circumstances" without the necessity of proving specific intent.  The lower courts did more than interpret the ordinance to survive constitutional scrutiny; they rewrote it in such a way as to fundamentally change its meaning.

We decline to follow this course and do not, therefore, decide the constitutionality of a hypothetical ordinance that prohibits something akin to "loitering with the specific intent to engage in an illegal drug-related activity."  Instead we must decide whether A.C.O. 138.26, as written and as applied to Rowland, survives constitutional scrutiny.

B. Rowland's Challenge: Vagueness and Overbreadth

Rowland has challenged the Akron ordinance as both impermissibly vague and overbroad under the federal and state Due Process Clauses.3  We find that the ordinance is defective in each respect depending on the interpretation of the role played by the circumstances enumerated in A.C.O. 138.26(B). The ordinance can be interpreted in only two ways.  The first is to read the enumerated circumstances as mere examples of the "circumstances" that can "manifest" a drug-related activity. Under this approach actual evidence that one or more of the specific circumstances exists is not necessary to support an arrest or sustain a conviction.  If this approach is followed the ordinance is unconstitutionally vague.  The second way to interpret the ordinance is to hold that evidence of one or more of the enumerated circumstances is necessary to support an arrest or sustain a conviction.  If this approach is followed the ordinance is unconstitutionally overbroad.  We will consider both interpretations and their attendant constitutional defects respectively.

1. The Void-for-Vagueness Doctrine

The black-letter explanation of the void-for-vagueness doctrine was stated by the United States Supreme Court in Grayned v. Rockford (1972), 408 U.S. 104, 108-109, 92 S.Ct. 2294, 2298-2299, 33 L.Ed.2d 222, 227-228:

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.  Vague laws offend several important values.  First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. *** Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. *** Third, but related, where a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.'" (Citations omitted.)

Due process requires that the terms of a criminal statute be reasonably clear and definite and that there be ascertainable standards of guilt on which citizens, courts, and the police may rely.  A person cannot be punished simply because the state believes that he or she is probably a criminal.  See Ricks v. Dist. of Columbia (C.A.D.C. 1968), 414 F.2d 1097, 1110 ("a citizen cannot be punished merely for being 'a suspicious person'").  It is a constitutional imperative that the dividing line between the lawful and the criminal be clear to all and not subject to conjecture.

If the circumstances enumerated in A.C.O. 138.26(B) do not form a sufficient basis for an arrest or conviction, the ordinance is unconstitutionally vague because it gives neither reasonable notice to citizens of what is prohibited nor

reasonable standards for those charged with its enforcement. As a result it also offends the third value protected by the void-for-vagueness doctrine: it chills or inhibits people's exercise of their constitutional rights.

### a. Notice to Citizens of Prohibited Conduct

A.C.O. 138.26 is unconstitutionally vague because it does not give people of ordinary intelligence a reasonable opportunity to know what conduct is prohibited. "Loitering," alone, is not a crime and cannot constitutionally be punished. "A presumption that people who might walk or loaf or loiter or stroll or frequent houses where liquor is sold, or who are supported by their wives or who look suspicious to the police are to become future criminals is too precarious for a rule of law." Papachristou, supra, 405 U.S. at 171, 92 S.Ct. at 848, 31 L.Ed.2d at 120. Accord Shuttlesworth v. Birmingham, supra, 382 U.S. at 90-91, 86 S.Ct. at 213, 15 L.Ed.2d at 179. A.C.O. 138.26, however, does not merely prohibit loitering -- it prohibits loitering under "circumstances" that may or may not be hallmarks of drug crime. The plain language of the ordinance most easily supports an interpretation that in making an arrest the police may look either to the enumerated circumstances or to circumstances taken from their experience as police officers.

Rowland argues that the ordinance is unconstitutionally vague on its face and as applied to him. We believe that Rowland's arguments demonstrate, first, that the ordinance, as applied to him, is "so unclear that he could not reasonably understand that it prohibited the acts in which he engaged." State v. Anderson (1991), 57 Ohio St.3d 168, 171, 566 N.E.2d 1224, 1227. There is no evidence that he committed a drug or any other offense. He spoke to people in two stopped cars, he stood in and around a convenience store, and he attempted to avoid the police when he was not in custody. None of these acts is illegal. Moreover, the ordinance does not per se proscribe these acts -- it simply permits the police to arrest people who do these things in a way that "manifest[s]" drug activity. Thus, without being able to read the officers' minds, Rowland cannot be expected to have known that his actions manifested to them the purpose to commit a drug crime.

Rowland also shows that the statute is unconstitutional on its face because "an individual of ordinary intelligence would not understand what he is required to do under the law." Anderson, supra, 57 Ohio St.3d at 171, 566 N.E.2d at 1226. "'[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process.'" State v. Diana (1976), 48 Ohio St.2d 199, 203, 2 O.O.3d 387, 389, 357 N.E.2d 1090, 1092 (quoting Connally v. Gen. Constr. Co. [1926], 269 U.S. 385, 391, 45 S.Ct. 126, 127, 70 L.Ed. 322, 323). The phrase "under circumstances manifesting the purpose to engage in drug-related activity" is unduly open-ended. If the average person carefully read A.C.O. 138.26, he or she could not be sure what specific acts "manifest" illegal activity. Even more disturbing, an average person who lives or works in a high-crime neighborhood could not be sure whether just standing on the street in front of his or her home or

workplace might "manifest" something illegal. Cross-examination of Councilman Williams and two Akron police officers during the hearing below on Rowland's motion to dismiss revealed considerable confusion as to what sorts of conduct could result in a conviction.

Subsection (B) provides that the enumerated circumstances are only examples of behavior that manifests drug activity. It states that eleven specific actions and statuses are "[a]mong the circumstances which may be considered in determining whether such purpose is manifested ***." (Emphasis added.) The word "among" indicates that there are other circumstances, not specified in the ordinance, which may be used to form the basis of an arrest and conviction. It is, of course, unlawful for a citizen to be convicted of a criminal offense not defined by a legislative enactment.4 We find this lack of specificity to be fatal to the ordinance. As the Washington Supreme Court observed in ruling on an ordinance very similar to A.C.O. 138.26: "A citizen cannot determine its meaning so that he may regulate his conduct. There is nothing in the ordinance that would enable him to know the dividing line between innocent loitering (for example, window shopping) and criminal loitering." Seattle v. Drew (1967), 70 Wash.2d 405, 410, 423 P.2d 522, 524, 25 A.L.R.3d 827, 833. Accordingly, A.C.O. 138.26 must fail, in part, because it provides citizens inadequate notice of what conduct is illegal.

### b. Enforcement Standards

A law is also impermissibly vague when it "delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." Grayned, supra, 408 U.S. at 108-109, 92 S.Ct. at 2299, 33 L.Ed.2d at 228. Under A.C.O. 138.26 the police and the courts are given unfettered discretion to determine whether a person's conduct "manifests" drug activity. Not only are most of the eleven enumerated "circumstances" extremely indefinite (e.g., "a person *** displays physical characteristics of drug intoxication or usage, such as *** [being] underweight, or [exhibiting] nervous and excited behavior," a "person behaves in such a manner as to raise a reasonable suspicion that he is about to engage *** in an unlawful drug-related activity," and the "area involved is by public repute known to be an area of unlawful drug use and trafficking") but, as stated above, the police and courts are expressly permitted to consider other, unidentified, "circumstances."

This sort of verbiage invites arbitrary and discriminatory enforcement and punishment. We are not left to speculate as to whether A.C.O. 138.26 is too vaguely worded to prevent arbitrary enforcement. Evidence of arbitrary law enforcement has been found in both national studies and in a study of the application of A.C.O. 138.26 prepared by an expert for the municipal court below.

As much as we would like it to be otherwise, we must acknowledge that without definite statutory language, criminal laws are susceptible to arbitrary enforcement, most often to the detriment of racial and ethnic minorities. Generally, "[w]hen a legislative body enacts a law that fails to provide minimal guidelines, it has in effect authorized police

officers, prosecutors, judges, and jurors to limit another's freedoms according to their own personal prejudices and predilections ***; it has authorized rule by whim rather than law."  Timmons v. Montgomery (M.D. Ala. 1987), 658 F.Supp. 1086, 1089.  Citing a number of studies, a recent commentator wrote that "when police are given wide discretion such as that under the general loitering and prowling law, they are likely to abuse it.  The reasons for abuse range from lack of proper training and guidance in assessing suspicious circumstances to isolation from the community to prejudices developed while on the police force."  (Footnotes omitted.)  Comment, supra, 50 Ohio St.L.J. at 729.  Often, racial minorities become the victims of vague laws.  A federal district court found in 1970 that "[n]egroes are arrested substantially more frequently than whites in proportion to their numbers. The evidence on this question was overwhelming and utterly convincing.  For example, negroes nationally comprise some 11% of the population and account for 27% of reported arrests and 45% of arrests reported as 'suspicion arrests.'"  (Emphasis added.)  Gregory v. Litton Sys., Inc. (C.D.Cal. 1970), 316 F.Supp. 401, 403.

In light of such evidence, we must be able to assure ourselves that a criminal law is sufficiently precise.  A.C.O. 138.26 is not.  Objectively, the plain language of the ordinance does not provide the necessary minimal guidelines for law enforcement.  It prohibits loitering "under circumstances manifesting the purpose to engage in drug-related activity ***."  (Emphasis added.)  The word "circumstances" is not defined in the ordinance.  The common definition of the word "circumstance," as the word is used in the ordinance, is:  "a condition, fact, or event accompanying, conditioning, or determining another ***."  Webster's Third New International Dictionary (1986) 410.  This, we feel, is too imprecise to give the police or the courts an objective basis upon which to measure criminal behavior or guilt.  Depending on the individual and his or her social class, peers, personal wealth, or any number of other factors, the "circumstances" surrounding the commission of a drug crime can vary enormously.  We believe that this lack of specificity leads inexorably to the very real danger that A.C.O. 138.26 may be enforced arbitrarily.

Our faith in this conclusion is strengthened by evidence that the ordinance has indeed been enforced almost exclusively against African-Americans.  Statistics collected and analyzed by Professor George Galster of the College of Wooster and introduced by Rowland in support of his motion to dismiss demonstrate that the ordinance is being applied in a racially discriminatory fashion.  His analysis revealed that (a) the areas in which A.C.O. 138.26 is being enforced have a disproportionately high percentage of African-American residents compared to the city of Akron as a whole,5 and (b) those arrested for violations of A.C.O. 138.26 are disproportionately African-American given the racial populations of the areas in which the arrests have occurred.6 The second conclusion is particularly disturbing:  over one three-month period, the populations of the areas in which A.C.O. 138.26 arrests occurred were only 55.2 percent African-American but 87.1 percent of the people arrested were African-American.  This means that even in areas where the

population is almost evenly racially mixed, the overwhelming number of arrests are of African-Americans.  The inference is clear:  police are more likely to believe that a black person is loitering "under circumstances manifesting the purpose to engage in drug-related activity" than they are to believe that a white person is.

In considering this argument it is important to remember that a person does not have to commit a drug-related offense to violate the ordinance.  The ordinance is prophylactic: it permits police to make an arrest before any crime has occurred.  The police do not need to have any evidence that a crime has occurred or is about to occur -- they can make an arrest based on subjective suspicion alone.  Unfortunately, some people's subjective suspicions are motivated by bias:

"Aggressive patrol tactics have their greatest impact in the minority community, where police officers have a well-documented tendency to base their behavior on negative stereotypes.  Studies show, for example, that police officers perceive blacks as more likely to engage in criminal activity or to be armed and dangerous.  When minorities are found outside minority neighborhoods, race may become the principal basis for an officer's suspicion.

"***

"*** [B]ased on their prejudices, police officers are more likely to stop minorities, and minorities are less likely to respond with deference because of their hostility toward police.  An officer will view lack of cooperation as an indication of guilt, thereby justifying an arrest."  (Footnotes omitted.)  Stormer & Bernstein, The Impact of Kolender v. Lawson on Law Enforcement and Minority Groups (1984), 12 Hastings Const. L.Q. 105, 116-117.

Our two conclusions, that the plain language of A.C.O. 138.26 does not give the police or the courts objective enforcement standards and that this vagueness has led inevitably to arbitrary enforcement, require us to hold that the ordinance is unconstitutionally vague.

                    2. Overbreadth

If we were to interpret the ordinance to require that evidence of one or more of the circumstances specifically enumerated in A.C.O. 138.26(B) must form the basis for an arrest or conviction, many (but perhaps not all) of the concerns regarding vagueness would be resolved.  Unfortunately, such an interpretation would collide with the related due process requirement that legislative enactments not be overbroad.

The purpose of the overbreadth doctrine is to provide the "breathing space" that "First Amendment freedoms need *** to survive[.]"  Natl. Assn. for the Advancement of Colored People v. Button (1963), 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405, 418.  In Grayned, supra, the Supreme Court gave the general definition of "overbreadth":  "A clear and precise enactment may *** be 'overbroad' if in its reach it prohibits constitutionally protected conduct."  Id., 408 U.S. at 114, 92 S.Ct. at 2302, 33 L.Ed.2d at 231.  In considering an overbreadth challenge, the court must decide "whether the ordinance sweeps within its prohibitions what may not be punished under the First and Fourteenth Amendments."  Id., 408

U.S. at 115, 92 S.Ct. at 2302, 33 L.Ed.2d at 231.

"Only a statute that is substantially overbroad may be invalidated on its face."  Houston v. Hill (1987), 482 U.S. 451, 458, 107 S.Ct. 2502, 2508, 96 L.Ed.2d 398, 410.  In order to demonstrate facial overbreadth, the party challenging the enactment must show that its potential application reaches a significant amount of protected activity.  Nevertheless, criminal statutes "that make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application."  Id. at 459, 107 S.Ct. at 2508, 96 L.Ed.2d at 410.  A statute is substantially overbroad if it is "susceptible of regular application to protected expression."  Id. at 467, 107 S.Ct. at 2512, 96 L.Ed.2d at 415.

Each of the eleven circumstances, with the possible exception of subsections (B)(2) and (B)(8), describes status or conduct which can be innocent and may be protected under the Constitution.  Among the circumstances A.C.O. 138.26(B) states "may be considered in determining whether such purpose is manifested" are: the suspect looks like a drug user, including being underweight or nervous (subsection [B][1]); the suspect behaves suspiciously, including hailing or stopping passing cars ([B][3]); the suspect is identified by police as a gang member ([B][4]); the suspect "transfers small objects or packages in a furtive fashion" ([B][5]); the suspect attempts to hide from the police ([B][6]); the suspect is in an area "known to be an area of unlawful drug use and trafficking" ([B][9]); or a "vehicle involved" is registered to a known drug user, regardless of the suspect's knowledge of such registration ([B][11]).

These circumstances, and others in the ordinance, can easily implicate a person's status, associates, mere presence, or otherwise innocent behavior.  We feel that they encroach on a "substantial amount of constitutionally protected conduct." Hill, supra, 482 U.S. at 459, 107 S.Ct. at 2508, 95 L.Ed.2d at 410.  The case law is legion that people cannot be punished because of their status, the company they keep, or their presence in a public place.  See, e.g., Roberts v. United States Jaycees (1984), 468 U.S. 609, 622, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462, 474 (freedom of association); Brown v. Texas (1979), 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (arrest cannot be based on "suspicion" alone);  Papachristou, supra, 405 U.S. at 169, 92 S.Ct. at 847, 31 L.Ed.2d at 119 ("Arresting a person on suspicion, like arresting a person for investigation, is foreign to our system, even when the arrest is for past criminality"); Button, supra (freedom of speech and association);  Robinson v. California (1962), 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758, ("status" of narcotic addition cannot be made criminal); Natl. Assn. for the Advancement of Colored People v. Alabama (1958), 357 U.S. 449, 460-461, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488, 1498-1499 (freedom of association).  People are also absolutely free to walk or run away from the police unless they are in custody.  See Terry v. Ohio (1968), 392 U.S. 1, 32-33, 88 S.Ct. 1868, 1885-1886, 20 L.Ed.2d 889, 912 (Harlan, J., concurring) ("ordinarily the person addressed has an equal right to ignore his interrogator and walk away").  We must remember, "[i]n our jurisprudence

guilt is personal, and when the imposition of punishment on a status or on conduct can only be justified by reference to the relationship of that status or conduct to other concededly criminal activity ***, that relationship must be sufficiently substantial to satisfy the concept of personal guilt in order to withstand attack under the Due Process Clause ***."  Scales v. United States (1961), 367 U.S. 203, 224-225, 81 S.Ct. 1469, 1484, 6 L.Ed.2d 782, 799.

In overturning a Richmond ordinance prohibiting loitering for purposes of prostitution, an ordinance quite similar to A.C.O. 138.26, a Virginia appellate court made this observation:

"Under the provisions of the Richmond ordinance, a person once convicted of prostitution could be arrested and convicted for window-shopping.  A hitchhiker could be arrested and convicted because she waved and beckoned to cars though she said not a word regarding solicitation or prostitution.  The ordinance may force people to curb their freedom of expression and association or risk arrest.  Even if the hitchhiker or former prostitute were acquitted due to lack of evidence of intent, an arrest would be justified under the statute, and the arrest itself chills first amendment rights."  (Citation omitted.)  Coleman v. Richmond (1988), 5 Va.App. 459, 465, 364 S.E.2d 239, 243.

Construing A.C.O. 138.26, as the municipal court did, to permit a finding of guilt based on the presence of a number of the circumstances enumerated in subsection (B), sweeps within the prohibitions of the ordinance many things that may not be constitutionally punished under the First and Fourteenth Amendments.  Accordingly, if we were to adopt this interpretation of A.C.O. 138.26, the ordinance would be impermissibly overbroad.

                              III

Like the laws invalidated in Papachristou and Kolender, A.C.O. 138.26 clearly and intentionally prevents isolated groups of citizens from enjoying their full constitutional rights.  Enforcement of the ordinance would deprive ordinary people of or discourage them from exercising their most basic speech, associational, and privacy rights simply because of their status, friends, neighborhood, appearance, or innocent behavior.  People who cannot afford to go to a club, a movie, or a restaurant to entertain themselves have no less a right to leave their homes than people who do; they simply have fewer places they can go -- and those places include the streets, shops, homes, and yards of their neighborhood.  We are also most concerned that the ordinance permits enforcement almost exclusively in African-American neighborhoods and almost entirely against African-Americans.  In short, even if the ordinance were a solution, or indeed the solution, to the drug crisis, it does not square with the more fundamental and timeless principles on which our Constitution is based.

"The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power.  It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards."  Almeida-Sanchez v. United States (1973), 413 U.S. 266, 273, 93 S.Ct. 2535, 2540, 37 L.Ed.2d 596, 603.

We hold that A.C.O. 138.26 violates the federal and Ohio Due Process Clauses because it can only be interpreted as impermissibly vague or overbroad. Accordingly, the judgment of the court of appeals is reversed and the cause is remanded to the Akron Municipal Court to enter a judgment of acquittal.

(Judgment reversed<br>
and cause remanded.)

Moyer, C.J., A.W. Sweeney and Pfeifer, JJ., concur.

Douglas, Resnick and F.E. Sweeney, JJ., dissent.

FOOTNOTES:

1  A.C.O. 138.26 provides:

"(A)  No person shall loiter in or near any thoroughfare, place open to the public, or near any public or private place in a manner and under circumstances manifesting the purpose to engage in drug-related activity contrary to any of the provisions of R.C. Chapter 2925.

"(B)  Among the circumstances which may be considered in determining whether such purpose is manifested are:

"(1)  Such person is a known unlawful drug user, possessor, or seller. For purposes of this chapter, a 'KNOWN UNLAWFUL DRUG USER, POSSESSOR, OR SELLER' is a person who has, within the knowledge of the arresting officer, been convicted in any court within this state of any violation involving the use, possession, or sale of any controlled substance as defined in R.C. Chapter 2925, or such person has been convicted of any violation of any of the provisions of R.C. Chapter 2925 or substantially similar laws of any political subdivision of this state or of any other state; or a person who displays physical characteristics of drug intoxication or usage, such as needle tracks, burned or calloused thumb and index fingers, underweight, or nervous and excited behavior;

"(2)  Such person is currently subject to a court order prohibiting his presence in a high drug activity geographic area;

"(3)  Such person behaves in such a manner as to raise a reasonable suspicion that he is about to engage in or is then engaged in an unlawful drug-related activity, including, by way of example only, such person acting as a lookout or hailing or stopping cars;

"(4)  Such person is physically identified by the officer as a member of a gang or association which has as its purpose illegal drug activity;

"(5)  Such person transfers small objects or packages in a furtive fashion;

"(6)  Such person takes flight or manifestly endeavors to conceal himself upon the appearance of a police officer;

"(7)  Such person manifestly endeavors to conceal any object which reasonably could be involved in an unlawful drug-related activity;

"(8)  Such person possesses any instrument, article, or thing whose customary or primary purpose is for the sale, administration, or use of controlled subjects [sic, substances] such as, but not limited to, crack pipes, push wires, chore boys, hand scales, hypodermic needles, razor blades, or other cutting tools;

"(9)  The area involved is by public repute known to be an

area of unlawful drug use and trafficking;

"(10)  The premises involved are known to the defendant to have been reported to law enforcement as a place of drug activity pursuant to R.C. Chapter 2925;

"(11)  Any vehicle involved is registered to a known unlawful drug user, possessor, or seller, or a person for whom there is an outstanding warrant for a crime involving drug-related activity.

"(C)  If any provision of this section is held invalid, such invalidity shall not affect any other provision, or the application thereof, which can be given effect without the invalid provision or application, and to this end the provisions of this section are declared to be severable.

"(D)  Whoever violates this section is guilty of loitering for the purpose of engaging in drug-related activity, a misdemeanor of the fourth degree."

2  As stated above, in this case, the municipal court expressly relied on the existence of five of the enumerated circumstances in reaching its judgment:  "This Court, frankly, believes that a combination of all these factors over a period of two hours after dark in the wintertime indicates something other than just standing out for sociability reasons."

3  The Fourteenth Amendment to the United States Constitution provides in part:

"Section 1.  All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.  No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." (Emphasis added.)

Section 1, Article I of the Ohio Constitution provides:

"All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety."

4  See R.C. 2901.03(A).  "This section codifies the doctrine, well settled for more than a century and a quarter, that there are no common law crimes in Ohio.  The section also codifies the corollary to the doctrine:  that criminal liability must be based on a statute or ordinance which (1) makes a prohibition or imposes a duty, and (2) provides a penalty for dereliction."  Committee Comment to R.C. 2901.03.

5  Professor Galster explained:

"I compared the racial composition of the census tracts wherein arrests pursuant to the aforementioned ordinance were made (from July-October, 1989) to that of Akron as a whole. According to 1980 U.S. Bureau of The Census statistics (the latest available), the thirteen tracts in which arrests occurred (according to Police Department records) had 39,126 residents; 21,603 of whom were black (55.2%).  By comparison, the entire City of Akron in 1980 had 237,177 residents; 52,719 of whom were black (22.2%).  Using a 'differences in proportions' test, yielding a Z-score of 2.863, I determined

that the above differences in percentages of blacks (55.2%
black in tracts where arrests made vs. 22% black in entire
city) was statistically significant (2-tail test) at the 1%
level.  This means that we are 99% confident that these
differences have not arisen due to chance."

6  Professor Galster explained:

"I compared the racial composition of the group arrested
under the aforementioned ordinance to the 1980 racial
composition of the tracts in which arrests occurred (using the
same data sources cited above).  Of the 132 people arrested
between July and October, 1989, 115 (or 87.1%) were black.  By
comparison, our estimate of the racial composition of the
thirteen tracts in which said arrests occurred is 55.2%.  Again
using the 'differences in proportions' test yielding a Z-score
of 2.313, I determined that the above differences in
percentages of blacks was statistically significant (2-tail
test) at the 5% level.  This means that we are 95% confident
that these differences have not arisen due to chance."

Alice Robie Resnick, J., dissenting.  After a thorough
consideration of Akron Codified Ordinance 138.26 ("A.C.O.
138.26"), I find it neither unconstitutionally vague nor
overbroad.  I therefore dissent.

A legislative enactment is entitled to a strong
presumption of constitutionality.  State v. Collier (1991), 62
Ohio St.3d 267, 269, 581 N.E.2d 552, 553; State v. Anderson
(1991), 57 Ohio St.3d 168, 171, 566 N.E.2d 1224, 1226.
Appellant has not overcome that presumption.

If an ordinance such as A.C.O. 138.26 is susceptible to
several judicial interpretations, and if one of those
interpretations will result in a finding that the ordinance is
constitutional, that is the preferred interpretation.  See
Collier, supra, 62 Ohio St.3d at 269, 581 N.E.2d at 553.  The
majority has initially interpreted A.C.O. 138.26 to contain no
specific intent element, and then has relied upon that premise
to find that the ordinance is both impermissibly vague and
overbroad.  However, in my opinion, the correct conclusion is
the one reached by the court of appeals:  A.C.O. 138.26 can
legitimately be read to include a specific intent requirement,
and is therefore constitutional.  In finding that the ordinance
contains a specific intent requirement, the court of appeals
cited two well-reasoned decisions which construed this very
ordinance and upheld it.  See Akron v. Holley (M.C.1989), 53
Ohio Misc.2d 4, 557 N.E.2d 861; Sheppard v. Akron (May 17,
1991), N.D.Ohio No. 90-CV-299, unreported.

The majority's statement that the lower courts in this
case "rewrote" the ordinance "in such a way as to fundamentally
change its meaning" is inaccurate.  It is clear to me that the
lower courts properly construed the ordinance to reach the
correct result.  The ordinance provides that an individual
commits a violation when he or she acts "under circumstances
manifesting the purpose to engage in drug-related activity
contrary to any of the provisions of R.C. Chapter 2925 [drug
offenses]."  Thus, in order to be arrested and convicted, not
only must an individual be loitering, but that individual must
also act with "the purpose to engage in drug-related activity."

While it appears the majority would require that the
statute read "with the specific intent to engage in

drug-related activity" in order to withstand constitutional scrutiny, such precision in drafting is not necessary. It is the task of the legislative body to draft the statute; it is the task of the courts to effectuate the will of the legislative body, if constitutionally permissible. "To be enforceable, legislation need not be drafted with scientific precision." Anderson, supra, 57 Ohio St.3d at 174, 566 N.E.2d at 1229. The ordinance is constitutional on its face. And where, as here, a trial judge recognizes that the specific intent element is present in the ordinance, and the defendant is found guilty because he acted with the requisite intent, the ordinance is constitutional as applied.

Since A.C.O. 138.26, when properly construed, contains a specific intent requirement, the ordinance is neither vague nor overbroad. The ordinance is not vague: appellant has been unable to show "'that no standard of conduct is specified at all.'" Anderson, supra, 57 Ohio St.3d at 171, 566 N.E.2d at 1226, quoting Coates v. Cincinnati (1971), 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214, 217. The ordinance is not overbroad: it does not punish for engaging in constitutionally protected conduct, but instead causes an individual to be subjected to arrest and conviction if the individual engages in criminal activities. See Colten v. Kentucky (1972), 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584.

In order to point out what conduct is implicated by the ordinance's prohibition, A.C.O. 138.26(B) lists eleven circumstances which are to be taken into account. The presence of these circumstances constitutes evidence of overt acts which indicate that an individual is loitering with the purpose to engage in illegal drug activity. As such, the circumstances serve as notice to potential defendants of the conduct the ordinance is intended to reach. Any one of the circumstances, standing alone, may not be grounds for an arrest and prosecution under the ordinance in most cases. However, when as here a number of circumstances are present at the same time, the probability increases dramatically that the individual is loitering with the purpose to engage in drug-related activity.

Evidence in the record indicates that A.C.O. 138.26 may have been (or is being) applied in a racially discriminatory manner, and this is extremely troubling. However, the fact remains that this defendant was appropriately arrested and convicted for violating a valid ordinance. Appellant was found to be doing more than loitering; he was found to be loitering with the purpose to engage in illegal activity. I would affirm the judgment of the court of appeals.

Douglas and F.E. Sweeney, JJ., concur in the foregoing dissenting opinion.