NAACP ANNE ARUNDEL COUNTY
BRANCH, et al.

v.

CITY OF ANNAPOLIS

No. CIV CCB–00–771.

United States District Court,
D. Maryland.

March 30, 2001.

David Lubitz, Milissa Murray, Michael L. Spafford, Swidler Berlin Shereff Friedman, LLP, Washington, DC, Dwight H. Sullivan, Baltimore, MD, for Plaintiffs.

Jefferson L. Blomquist, Funk & Bolton, P.A., Balimore, MD, Paul G. Goetzke, Office of Law, Annapolis, MD, Curtis E. Gannon, Miguel A. Estrada, Gibson Dunn and Crutcher, LLP, Washington, DC, for Defendant.

## MEMORANDUM

BLAKE, District Judge.

The plaintiffs, the NAACP Anne Arundel County Branch ("NAACP") and three named individuals, have challenged the constitutionality of an anti-loitering ordinance passed by the City of Annapolis ("City"). In that challenge, the plaintiffs allege that the ordinance is overbroad and vague, violates their substantive due process rights, and constitutes an unlawful delegation of legislative authority. Cur-

rently pending before the court are cross motions for summary judgment. The motions have been fully briefed, and a hearing was held on February 16, 2001. For the reasons that follow, the court will grant the plaintiffs' motion for summary judgment and deny the City's motion.

### BACKGROUND

#### The Ordinance

On October 11, 1999, the Annapolis City Council adopted Ordinance No. 0–19–99 entitled "Drug–Loitering Free Zones." The ordinance amended the City Code by adding § 11.12.067 to Title 11 of Chapter 12. (Mem. Sup. Mot. for Sum. Jud. at 3, Ex. 2.) The ordinance itself was amended on March 13, 2000 by the passage of Ordinance No. 0–7–2000 ("the ordinance"). The amending ordinance altered the language of several provisions of the original law, but left intact its name and framework.[1] The amended ordinance is challenged in this case.

The ordinance sets out a procedure whereby the city council may designate certain areas in the city "Drug–Loitering Free Zones." (Ordinance § B.) That procedure is begun when a neighborhood association or private citizen submits an application to the city council. (*Id.* § B.1.)[2]

"If ... the chief of police confirms that three or more arrests for drug-related activity have occurred in the area identified in the application during the twenty-four month period immediately preceding the date of the application," the city council "shall, by resolution, designate the area ... a Drug–Loitering Free Zone." (*Id.* §§ B.2–B.3.) The zone will be demarcated with signs. (*Id.* § B.4.) The designation terminates after 24 months unless the resolution is renewed. (*Id.* § B.5.)

The ordinance makes it a misdemeanor for "any person meeting any one of the three criteria set forth in Subsection D of this section who is loitering in a public place located within a posted Drug–Loitering Free Zone, to disobey the order of a police officer to move on." (Ordinance § C.) Subsection D of the ordinance then provides that:

[a]n officer shall not order a person to move on under Subsection C of this section unless one of the following circumstances shall exist:

1. The person is behaving in a manner indicating that the person is remaining at or in a public place located within a Drug–Loitering Free Zone for the purpose of engaging in drug-related activity

---

**1.** The amendments changed the ordinance in three significant ways. First, the ordinance as originally conceived made it criminal "to loiter" and allowed a police officer to arrest a person doing so if he failed to obey the officer's order to move on. The amended version makes it criminal for a person "who is loitering ... to disobey the order of a police officer to move on." (Mem. Sup. Mot. for Sum. Jud., Ex. 3 at 3, original §§ C–D.) Second, the amendments removed "engaging in conversations" from the list of activities that demonstrate an intent to participate in drug-related activity. (*Id.*, original § E.1.) Finally, the original ordinance included being a "known unlawful drug user, possessor, seller or buyer" and remaining in a designated zone as a sufficient reason for an officer to issue an order to move on. The amendments added a requirement that the person be subject to a court order prohibiting his or her presence in a high drug activity area. (*Id.*, original § E.3.)

**2.** Section B of the ordinance provides that:

[a]n application to designate the following areas a Drug–Loitering Free Zone may be filed with the city clerk by the following persons:

a. A neighborhood association may apply to have its neighborhood designated a Drug–Loitering Free Zone;

b. Any city resident may apply to have the area located within five hundred feet of real property owned or leased by the resident designated a Drug–Loitering Free Zone;

c. The owner or any resident of a multi-unit residential structure may apply to have the property on which the structure is located designated a Drug–Loitering Free Zone;

d. The owner of any commercial property may apply to have the property designated a Drug–Loitering Free Zone.

as demonstrated by any of the following acts: repeatedly approaching vehicles or making hand signals associated with drug related activity to the drivers and/or passengers of vehicles; while in a vehicle, repeatedly calling or making hand signals associated with drug-related activity to individuals outside the vehicle; distributing small objects to other persons; exchanging currency for small objects; warning others of the arrival or presence of a police officer; concealing himself or herself or any small object from view; or engaging in a pattern of any other conduct normally associated by law enforcement agencies with the illegal distribution, purchase or possession of drugs; or

2. The police officer has received reliable information from a reliable source indicating that the person is engaging in drug-related activity in a Drug–Loitering Free Zone;[3] or

3. The person is a known unlawful drug user, possessor, seller or buyer and is currently subject to a judicial order prohibiting his/her presence in a high drug activity geographic area.

If the person refuses to obey the order to move on, she is subject to arrest. (*Id.* § C.) If convicted of violating the statute, that person can be subjected to six months in prison, a $1000 penalty, or both. (*Id.* § E.)

To date, eight applications have been filed under the statute. Four of those applications have been approved, and four are still pending. (Mem. Sup. Mot. for Sum. Jud. at 6.) Each of the eight areas proposed for designation as a Drug–Loitering Free Zone appears to be in a community with predominantly African–American residents. (Pls' Reply, Ex. N.) The City has suspended enforcement of the ordinance pending the outcome of this litigation. (Mem. Sup. Mot. for Sum. Jud. at 6 n. 3.) Thus, no signs have been posted, and no arrests have been made under the ordinance.

*The Lawsuit*

The plaintiffs in this case are the NAACP and three individual residents of Annapolis, Larry Griffin, Kenith Dean, and Parris Lane. (Compl.¶¶ 5–9.) They originally filed their complaint on February 16, 2000 in the Circuit Court for Anne Arundel County Maryland; accordingly, it challenged the unamended ordinance. (Mem. Sup. Pl.'s Opp. and Cross–Mot. at 5.) The defendants removed the case to this court before the amendments were passed. When they were passed, however, the amendments undermined several of the constitutional challenges. Accordingly, the plaintiffs filed an amended complaint in this court.[4]

In the amended complaint, the plaintiffs state four causes of action. They seek a declaration that the ordinance is unconstitutional and an injunction prohibiting its enforcement. Specifically, in Count I, they allege that subsections D.1 and D.3 of the ordinance are unconstitutionally overbroad in violation of the First and Fourteenth Amendments to the United States Constitution and Articles 24 and 40 of the Maryland Declaration of Rights. (*Id.* ¶¶ 40–42.) The second Count alleges that the same sections of the ordinance are unconstitutionally vague in violation of the same federal and state provisions. (*Id.* ¶¶ 44–46.) Count III alleges that subsection D.1 violates the Due Process Clause of the Fourteenth Amendment and Article 40 of the Maryland Declaration of Rights by impermissibly infringing on the plaintiffs' liberty

**3.** This specific provision, § D.2, is not challenged by the plaintiffs.

**4.** In response to the original complaint, the City filed a motion to dismiss, which it withdrew as moot once the amended complaint was filed. The City also moved to strike the Annapolis Police Department as a defendant.

Because the department is not named in the amended complaint, the City also withdrew that motion. (CCB–00–771, Order granting motion to withdraw motions to dismiss the complaint and to strike as moot, issued April 24, 2000.)

rights. (*Id.* ¶¶ 48–49.) Finally, in Count IV, the plaintiffs allege that, because the City has no discretion to deny a properly-filed application, the ordinance constitutes an unlawful delegation of legislative authority in violation of the Due Process Clause, Maryland Constitution, Maryland Code, and Annapolis City Charter. (*Id.* ¶¶ 50–54.)

The City filed a motion for summary judgment in which it disputes the overbreadth, vagueness, substantive due process, and impermissible delegation challenges and alleges that the NAACP lacks standing to assert the claims on behalf of its members. The plaintiffs filed an opposition to that motion and a cross-motion for summary judgment. The City later filed a "Motion to Dismiss and Supplemental Motion for Summary Judgment" in which it argued for the first time that the individual plaintiffs each lack standing to sue on his or her own behalf. The motions are addressed below, beginning with the issue of standing.

## STANDING

The standing challenge in this case is twofold. The City contends that each of the individual plaintiffs lacks standing to assert the claims in his or her own right and that the NAACP lacks standing to assert the claims as a representative of its members. These contentions overlap because the NAACP must show, as part of proving that it can assert representational standing, that its individual members would have standing to bring the suit on their own behalf. As explained by the Supreme Court,

> [a]n association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit.

*Friends of the Earth v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 181, 120 S.Ct. 693, 704, 145 L.Ed.2d 610 (2000) (citing *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383, (1977)). *See also Maryland Highways Contractors Ass'n, Inc. v. Maryland,* 933 F.2d 1246, 1250–51 (4th Cir.1991). The NAACP has offered the declarations of three individual members as proof that each could assert standing individually.

Because the initial analyses are identical, the evaluations of the individual plaintiffs' and NAACP members' standing have been consolidated. To the extent that its individual members have standing, the analysis of the second two prongs of the organizational standing rubric is the same for all counts in the complaint as it applies to the NAACP.

### I. Individual Plaintiffs and NAACP Members

■ To satisfy the "irreducible constitutional minimum of standing," *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992), an individual plaintiff has the burden to show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Laidlaw,* 528 U.S. at 180–81, 120 S.Ct. at 704. *See also Defenders,* 504 U.S. at 560, 112 S.Ct. at 2136. The City does not challenge standing based on the second or third prongs of the analysis, and the court acknowledges that all plaintiffs have met those criteria. The City does, however, contend that none of the individuals has alleged an "injury in fact" sufficient to confer standing.

The NAACP has submitted declarations from two members, Leroy Bowman and

Robert Eades, and its president, Gerald Stansbury, to demonstrate that each could assert standing on his own behalf. (Pl.s' Opp. and Cross–Mot., Ex. N, O, P.) Mr. Eades states in his declaration that, as part of a program in which he counsels young men to "steer them away from crime and drugs," he "frequently stands on the sidewalks" in two of the areas that have already been designated Drug–Loitering Free Zones. (*Id.*, Ex. N ¶¶ 6–10.) He alleges further that he was ordered to move on while participating in that activity on two occasions in those areas. (*Id.* ¶¶ 8, 10.) On both occasions, he refused to move and was not arrested. Finally, he states that if enforcement of the ordinance is resumed, he will continue to counsel drug addicts and will not move on if ordered to do so. (*Id.* ¶¶ 9, 11.) Similar statements were made by Mr. Bowman, except that he has not yet been asked to move on. (*Id.*, Ex. O.) In his declaration, Mr. Stansbury states that, as part of a voter registration drive called "Operation Big Vote," he and other members of the NAACP "repeatedly approached individuals ... [and] distributed small objects, such as voter registration cards and pens, to them." (*Id.*, Ex. P ¶¶ 4–6.) The NAACP argues that such activities could subject Mr. Stansbury to an order to move on. Thus, each NAACP member anticipates participating in activities that, while not drug-related, are described in the ordinance as demonstrating an intent to participate in drug-related activity. (*Id.*, Ex. N, O, P; ordinance § D.1.)

Similarly, the named plaintiffs each allege that they conduct activities which may be precluded by the ordinance in neighborhoods that are or may be designated Drug–Loitering Free Zones. Mr. Griffin testified at a city council meeting that he stands on street corners and talks with drug addicts and rape victims as part of counseling them. (Pl.s' Opp. to Mot. to Dis. and Supp. Mot. for Sum. Jud., Ex. F. at 101–05.) At the same meeting, Ms. Lane testified that she was ordered by a police officer to move on while standing on a corner speaking with some friends. (*Id.* at 214–15.) No testimony from that hearing was attributed to Mr. Dean, and he has not submitted a declaration or affidavit. In their complaint, however, the plaintiffs state that he counsels drug addicts and believes the ordinance will inhibit his ability to do so. (Compl. ¶¶ 8, 38.)

The City contends that these allegations are insufficient to confer standing on the individual plaintiffs and NAACP members because there is no contention that the ordinance will deter them from the conduct they claim is prohibited. (Mem. Sup. Mot. to Dis. and Supp. Mot. for Sum. Jud. at 3–4.) Further, the City argues that there is no credible threat of prosecution under the statute because none of the plaintiffs would be arrested for counseling drug addicts or meeting friends (*Id.* at 7–8.)

■ Initially, it is important to note that the plaintiffs do not challenge the ordinance as applied to them. Indeed, none has been arrested. Rather, they mount a facial challenge to its constitutionality. In such cases, the Supreme Court has created an exception to the traditional rules of standing for overbreadth challenges. In *Broadrick v. Oklahoma,* the Court wrote that it

has altered its traditional rules of standing to permit—in the First Amendment area—'attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.' Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.

413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973) (internal citation omit-

ted). *See also Board of Airport Commissioners of the City of Los Angeles v. Jews for Jesus,* 482 U.S. 569, 574, 107 S.Ct. 2568, 2572, 96 L.Ed.2d 500 (1987) ("Under the First Amendment overbreadth doctrine, an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face 'because it also threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid.'") (quoting *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 503, 105 S.Ct. 2794, 2802, 86 L.Ed.2d 394 (1985)). The Court has applied the same relaxed standard to challenges based on vagueness. *See Kolender v. Lawson,* 461 U.S. 352, 358 n. 8, 103 S.Ct. 1855, 1859 n. 8, 75 L.Ed.2d 903 (1983); *Coleman v. City of Richmond,* 5 Va.App. 459, 364 S.E.2d 239, 241–42 (1988) (permitting facial challenges on overbreadth and vagueness grounds); *City of Tacoma v. Luvene,* 118 Wash.2d 826, 827 P.2d 1374, 1381–82 (1992) ("Courts will permit third party standing for overbreadth challenges when the law in question chills or burdens constitutionally protected conduct.")

Thus, the inquiry for the overbreadth and vagueness analyses does not concern the application of the ordinance to these particular plaintiffs but, rather, whether the ordinance may infringe protected speech or conduct. The City contends that it does not because there is "no First Amendment right to loiter, to socialize, to cower in a corner, or to distribute small items in a public thoroughfare." (Mem. Sup. Mot. to Dis. and Supp. Mot. for Sum. Jud. at 10.) This argument is unpersua-

sive. For the reasons explained below, the court concludes that the ordinance burdens sufficient speech and conduct protected by the First Amendment to grant both the individual plaintiffs and the NAACP standing to assert the overbreadth and vagueness claims.[5]

■ Further, even if the relaxed standard were not available, the plaintiffs have satisfied the traditional injury in fact requirement for pre-enforcement review of the ordinance.[6] As the Supreme Court stated,

> [w]hen the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief."

*Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 298–99, 99 S.Ct. 2301, 2309, 60 L.Ed.2d 895 (1979) (quoting *Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973)).[7] As discussed in Analysis Section III below, the statute infringes "conduct arguably affected with a constitutional interest." The City contends that there is no rational risk of arrest if the individuals are not engaged in drug-related activity. If the ordinance contained a separate mens rea requirement, that contention would be correct, to the extent that the plaintiffs' claims then would depend on the likelihood of mistaken application of the ordinance. Because there is no such requirement on the face of the ordinance, however, and because

---

5. *See infra,* Analysis Section III: Overbreadth.

6. This requirement would apply to the substantive due process and impermissible delegation claims.

7. A plaintiff also may show an injury in fact by demonstrating that she will forego some constitutionally protected activity for fear of prosecution under the statute. *See North Carolina Right to Life, Inc. v. Bartlett,* 168 F.3d

705, 710 (4th Cir.1999) (finding a case or controversy when the plaintiffs ceased production of a voter brochure for fear of prosecution). None of the plaintiffs make such a claim. Rather, Mr. Eades and Mr. Bowman have indicated that they will not change their behavior and would refuse to move on if so ordered. (Pl.s' Opp. and Cross–Mot., Ex. N, O.)

the plaintiffs have alleged that they will continue activities that have previously resulted in orders to move on under the ordinance, the City's argument is unpersuasive.[8] There is a credible threat that one of the plaintiffs will be ordered to move on while, for example, counseling a drug addict or participating in a voter registration drive, will refuse to do so, and will be arrested. The case law does not require the plaintiffs to show more.[9]

## II. "Germane to the Organization's Purpose"

■ The City also argues that, because there is no allegation that the ordinance discriminates on the basis of race, the lawsuit is not germane to the purpose of the NAACP. (Mem. Sup. Mot. for Sum. Jud. at 10; Def.'s Reply and Opp. at 5–7.) According to its constitution and by-laws, the "Purpose and Aims" of the NAACP branch are to "improve the political, educational, social and economic status of minority groups; to eliminate racial prejudice; to keep the public aware of the adverse effects of racial discrimination; and to take lawful action to secure its elimination . . . ." (Pl.s' Opp. and Cross–Mot., Ex. R § 3.) The NAACP argues that the lawsuit is a way that it can "take lawful action to secure" the elimination of racial discrimination because anti-loitering laws in general "have in the past been disproportionately enforced against African–Americans and other people of color." (Id. at 15.) In support of this argument, the NAACP relies on the Ohio Supreme Court's conclusion in City of Akron v. Rowland that police officers are more likely to abuse the discretion granted to them under anti-loi-

tering laws to harass black citizens than they are to harass white citizens. 67 Ohio St.3d 374, 618 N.E.2d 138, 146–47 (1993) (citing studies of arrest statistics and a 1970 opinion from the Central District of California); see also City of Chicago v. Morales, 527 U.S. 41, 54 n. 20, 119 S.Ct. 1849, 1858 n. 20, 144 L.Ed.2d 67 ("[V]agrancy laws were used after the Civil War to keep former slaves in a state of quasi slavery.")

The NAACP also cites arrest statistics which indicate that African–American residents are arrested for criminal violations disproportionately to their percentage of the city's population. (Pl.s' Reply at 10, stating that, although African–Americans constitute only 33% of the city's population, they are the subjects of 68% of the arrests generally and 71% of the drug-related arrests; Id., Ex. W.) Most importantly, however, the NAACP notes that the ordinance has been, and will continue to be, enforced primarily in African–American neighborhoods. (Pl.s' Opp. and Cross–Mot. at 16.) Indeed, the four areas already designated Drug–Loitering Free Zones and the four areas subject to pending applications are populated largely by African–Americans. (Id., Ex. N.) Together, these allegations are sufficient to prove that the ordinance may disproportionately impact black residents. Opposing it in court, therefore, is germane to the purpose of the NAACP.

## III. Participation of the Individual Members

■ Finally, the City argues that the NAACP should not be allowed to assert

8. See, infra, Analysis Section I for a detailed explanation of the ordinance's lack of a mens rea requirement.

9. The plaintiffs also contend, albeit in a footnote, that they can assert standing based on their status as taxpayers. In support of that argument, they cite the Maryland Court of Appeals opinion in State v. Burning Tree Club, Inc., 315 Md. 254, 554 A.2d 366 (1989) for the proposition that Maryland courts recognize a limited taxpayer standing. Based on the Supreme Court's oft-cited opinion in Frothingham v. Mellon, 262 U.S. 447, 487, 43

S.Ct. 597, 601, 67 L.Ed. 1078 (1923), the City argues in response that federal courts do not allow standing on that basis unless the plaintiff can show a "direct and immediate" interest. The court need not address this contention because, even if Maryland law were applied, the plaintiffs cannot demonstrate "that the statute, as applied, actually or potentially increases [their] tax burden." Burning Tree, 554 A.2d at 385. They have made no showing that taxes will increase as a result of the ordinance.

representational standing because the participation of its individual members is required. The City contends that there is a conflict of interest among the individual members because some will benefit from the ordinance even if others oppose it. If such a conflict of interest existed, the organization would not be able to effectively represent its membership, and the individual members would be required to participate. *Maryland Highways*, 933 F.2d at 1253. The basis for the City's argument is that the ordinance will benefit black communities. (City's Reply and Opp. at 8–9.) The City, however, has slightly misconstrued the standard. The NAACP is not required to show that every African-American member of the community opposes the ordinance or will not benefit from it. Rather, the NAACP must show that it can adequately represent its membership.[10]

The City attempts to create a conflict of interest by alleging that some members of the NAACP will benefit from the ordinance because they live in the neighborhoods designated as Drug–Loitering Free Zones. (*Id.*) First, the City has produced no evidence in support of its assumption that there are members of the NAACP living in a neighborhood designated as a Drug–Loitering Free Zone or in an area that is the subject of a pending application. Further, the NAACP contends that the City has offered no proof the anti-loitering law will benefit anyone, let alone its members. Indeed, the City has not shown that anti-loitering ordinances in general have any impact on drug-related crime.[11] Moreover, the NAACP has stated that "the decision to participate as a plaintiff was discussed and voted on in meetings

that were publicly advertised and open to all NAACP members . . . ." (Pls.' Reply at 12–13, Ex. Y, Stansbury Decl.) *Cf. Maryland Highways*, 933 F.2d at 1253 (finding suspicious the Board of Directors' decision not to tell its members about the litigation until after suit was filed); *Maryland Minority Contractor's Ass'n, Inc. v. Maryland Stadium Authority*, 70 F. Supp.2d 580, 590 (D.Md.1998), *aff'd*, 198 F.3d 237 (4th Cir.1999) (finding no organizational standing when some members would benefit from the statute and there was no "indication of how the decision to attack the . . . statute was made, or of how much support for the suit exists within the membership . . . ."). In this case, the NAACP has demonstrated that there is no conflict of interest preventing effective representation of its membership. The participation of its individual members in the lawsuit, therefore, is not required. Accordingly, the court finds that the NAACP and the individual plaintiffs all have standing to challenge the Annapolis ordinance.

## ANALYSIS

The plaintiffs assert four challenges to the ordinance which are evaluated in the sections that follow. To the extent that the plaintiffs' claims are brought under provisions of both the Maryland and federal constitutions, neither party has argued that the state and federal claims should be subject to different standards in any way. Indeed, the analyses are identical in this context. *See DiPino v. Davis*, 354 Md. 18, 729 A.2d 354, 367 (1999). Before analyzing those claims, however, the court will resolve the dispute surrounding the mens

---

10. This distinction invalidates the City's argument that it could better represent the black communities in Annapolis than could the NAACP. (Mem. Sup. Mot. to Dis. and Supp. Mot. for Sum. Jud. at 11–13.) It also renders irrelevant the City's attempt to prove that black members of the community supported the ordinance at open meetings. Indeed, if the City's contention were correct, an organization could never prove standing sufficient

to challenge a governmental enactment because government, by its nature, should be the best representative of the population it regulates.

11. This argument by itself is not sufficient to award the plaintiffs standing, because residents may benefit in other ways.

rea requirement in the ordinance.[12]

## I. Mens Rea

 The court's first step in evaluating the merits of the plaintiffs' constitutional claims is to determine whether the ordinance includes a specific intent requirement. This inquiry affects the vagueness, overbreadth, and substantive due process challenges because it determines the scope of the behavior which may give rise to an order to move on. In relevant part, the ordinance provides that an officer may only order a person to move on if that person "is behaving in a manner indicating that the person is remaining at or in a public place located within a Drug–Loitering Free Zone for the purpose of engaging in drug-related activity as demonstrated by any" one of a series of described acts. (Ordinance § D.1)

The City contends that the inclusion of the phrase "for the purpose of engaging in drug-related activity" establishes the presence of a specific intent requirement; it argues that a person can only be required to move on if he has the intent to participate in drug-related activity. The City also argues that if the ordinance is not clear on its face, canons of statutory construction require the court to interpret it in such a way that it contains a mens rea requirement. In response, the plaintiffs argue that the statute does not include a specific intent requirement and that the court lacks the authority to construe it in the manner advocated by the City. They point to statements by the bill's sponsor indicating that the ordinance was crafted specifically to avoid a mens rea requirement.

First, the court cannot agree with the City's argument that the plain language of the ordinance includes a mens rea requirement. The ordinance does not require a person to act "with the intent" or "with the purpose" to participate in drug-related activity. Rather, it requires that the person "behave in a manner *indicating* ... the purpose of engaging in drug-related activity." (Ordinance § D.1, emphasis added.) The list of activities specified in section D.1 "demonstrate" that the person is indicating that criminal intent. They do not require the person actually to possess the unlawful intent. *See Rowland*, 618 N.E.2d at 144 ("Acting under 'circumstances manifesting' a purpose to do something is a far cry from specifically intending to do something."); *Louisiana v. Muschkat*, 706 So.2d 429, 434–35 (La.1998) (finding that the court could not "read a specific intent requirement into [the ordinance at issue] because to do so would not be plausible"); *Wyche v. State*, 619 So.2d 231, 236 (Fla. 1993) ("We find that it is impossible to preserve the constitutionality of the Tampa ordinance without effectively rewriting it, and we decline to 'legislate' in that fashion."). *Cf. Northern Virginia Chapter, American Civil Liberties Union v. City of Alexandria*, 747 F.Supp. 324, 328 (E.D.Va. 1990) (finding a city ordinance overbroad where "[u]nlawful intent may be derived from the mere occurrence of the seven enumerated circumstances"). Thus, the court concludes that the City ordinance plainly does not include a mens rea requirement.[13]

---

12. The court also notes that the Fourth Circuit has recently issued an opinion related to an anti-loitering ordinance. *Lytle v. Griffith*, 240 F.3d 404 (4th Cir.2001). In that case, however, the Fourth Circuit vacated the district court's holding that an anti-loitering ordinance was unconstitutional because the lower court had failed to give proper consideration to Eleventh Amendment sovereign immunity concerns. That ruling does not affect the analysis of this case.

13. Both at oral argument and in its pleadings, the City also relies on what it calls the "catch-all" provision as evidence that the ordinance contains a mens rea requirement. (City's Reply and Opp. at 13.) That section allows an officer to order a person to move on if he is "engaging in a pattern of any other conduct normally associated by law enforcement agencies with the illegal distribution, purchase or possession of drugs." (Ordinance § D.1) This section does not, however, alter the structure of the ordinance which leads the

Even if the ordinance were ambiguous in this regard, however, the court could not construe its language in the manner advocated by the City. First, the legislative history does not support such an interpretation. At a city council meeting, Alderman McMillan, the ordinance's sponsor, discussed the problems Baltimore City had with a similar ordinance. He stated that

> [t]he point is, we avoided the pitfall of this particular law .... This isn't about intent to distribute. The difficulty with the Baltimore law, is proving intent. And quite honestly, in the last public hearing we had, a lot of things came out that I felt were valuable and useful. And one of the things that was valuable and useful was trying to remove intent. And we've done that. We have measurable criteria.

(Pl.s' Opp. and Cross Motion, Ex. B at 245–46.)[14] Alderman McMillan thus indicated that he thought the ordinance did not contain a specific intent requirement. Further, in June 2000, the City published a set of legislative findings designed to support the ordinance. Those findings indicate that the purpose of the ordinance is to protect citizens from the dangers of the drug trade. (Pl.s' Opp. and Cross–Mot., Ex. L.)[15] According to the legislative findings, the ordinance will further that goal by "criminalizing the act of ignoring a lawful order to move on when found loiter-

ing within such a drug-loitering free zone while meeting the criteria of 0–7–00 ...." (*Id.*) Nowhere in the legislative findings, however, does the city council mention that the person loitering must actually be involved, or intend to become involved, in drug-related activity. Thus, the legislative history of the ordinance does not support the conclusion that the ordinance includes a mens rea requirement.

Despite that legislative history, the City argues that several canons of statutory construction require the court to interpret the ordinance as containing a specific intent requirement. First, the City contends that the court is required to construe an ambiguous statute so as to avoid casting doubt on its constitutionality. *See, e.g., Boos v. Barry,* 485 U.S. 312, 331, 108 S.Ct. 1157, 1169, 99 L.Ed.2d 333 (1988) ("federal courts have the duty to avoid constitutional difficulties by doing so if such a construction is fairly possible"). The court's authority, however, is limited because the ordinance is not a federal law. *See Hynes v. Mayor and Council of the Borough of Oradell,* 425 U.S. 610, 622, 96 S.Ct. 1755, 1761–62, 48 L.Ed.2d 243 (1976) ("Even assuming that a more explicit limiting interpretation of the [city] ordinance could remedy the flaws we have pointed out ... we are without power to remedy the defects by giving the ordinance consti-

court to conclude that it lacks a mens rea requirement. Nor does it provide any direct indication that a person must actually possess an intent to participate in drug-related activity, rather than acting as if he had such an intent. Further, for the reasons explained below, the court concludes that this phrase is unconstitutionally vague.

**14.** The Baltimore law referenced by Alderman McMillan prohibited loitering in a "certified drug free zone ... for the purpose of engaging in drug-related activity ...." *Powers v. State,* 329 Md. 321, 619 A.2d 538, 542 (1993). In contrast, the City ordinance at issue in this case prohibits a person from loitering while "behaving in a manner indicating that the person is remaining at or in a public place located within a Drug–Loitering Free Zone for the purpose of engaging in drug-related

activity ...." (Ordinance § D.1) In *Powers,* the Maryland Court of Appeals determined that the "the purpose of engaging in drug-related activity" was an element of the activity prohibited by the Baltimore ordinance and that the state had failed to prove such an intent in its prosecution of Mr. Powers. 619 A.2d at 542–43. By his statement, Alderman McMillan suggests that the language in the City ordinance will prevent a court from construing it to include the element of specific intent.

**15.** The plaintiffs argue that these findings should be disregarded because they were adopted after the ordinance was passed and amended. (Pl.s' Opp. and Cross–Mot. at 8–9.) Because the court concludes that the legislative findings do not support the City's position, it will not address this argument.

tutionally precise content."); *Grayned v. City of Rockford,* 408 U.S. 104, 110, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222 (1972) (" 'Extrapolation,' of course, is a delicate task, for it is not within our power to construe and narrow state laws." (internal citations omitted)); *Gooding v. Wilson,* 405 U.S. 518, 520, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408 (1972) (finding that only the state court could provide a narrowing construction); *U.S. v. Thirty–Seven (37) Photographs,* 402 U.S. 363, 369, 91 S.Ct. 1400, 1405, 28 L.Ed.2d 822 (1971) (stating that federal courts "lack jurisdiction authoritatively to construe state legislation"); *Schleifer v. City of Charlottesville,* 159 F.3d 843, 871 n. 11 (4th Cir.1998) (Michael, J. dissenting); *Virginia Society for Human Life, Inc. v. Caldwell,* 152 F.3d 268, 270 (4th Cir.1998) ("Federal courts have the power and duty to adopt narrowing constructions of federal statutes 'if such a construction is fairly possible,' but 'federal courts are without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent.' ") (quoting *Boos,* 485 U.S. at 330, 108 S.Ct. at 1168–69). Because both its plain language and legislative history demonstrate that the ordinance was not intended to contain a mens rea requirement, the court finds itself without the authority to construe it as having one.

As a corollary, the City argued at the hearing that, if the court did not find a specific intent requirement on the face of section D, it was required to read one into the ordinance unless there was a manifest statement to the contrary. In support of that assertion, counsel cited the Supreme Court's opinion in *U.S. v. X–Citement Video,* 513 U.S. 64, 78, 115 S.Ct. 464, 472, 130 L.Ed.2d 372 (1994) ("[A] statute completely bereft of a scienter requirement ... would raise serious constitutional doubts. It is therefore incumbent upon [the Court] to read the statute to eliminate those

doubts so long as such a reading is not plainly contrary to the intent of Congress."). *See also Liparota v. U.S.,* 471 U.S. 419, 426, 105 S.Ct. 2084, 2088, 85 L.Ed.2d 434 (1985); *City of Tacoma v. Luvene,* 118 Wash.2d 826, 827 P.2d 1374, 1383–84 (1992) (interpreting an anti-loitering ordinance to include a mens rea requirement). Those cases, however, are distinguishable from this situation because they involved a federal court interpreting a federal statute and a state court interpreting a state statute. For the same reason it lacks authority to narrow a state statute, this court is without the authority to add a specific intent requirement.[16]

Finally, the City also argues that, if there is any doubt as to the specific intent requirement, the police will be bound by the City's interpretation and will, therefore, only issue orders to move on if a person has the requisite intent. (City's Reply and Opp. at 14–15.) The court recognizes that "[i]n evaluating [the plaintiffs'] facial challenge, [it] must consider the [City's] authoritative constructions of the ordinance, including its own implementation and interpretation of it." *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 131, 112 S.Ct. 2395, 2402, 120 L.Ed.2d 101 (1992). *See also Ward v. Rock Against Racism,* 491 U.S. 781, 795–96, 109 S.Ct. 2746, 2756, 105 L.Ed.2d 661 (1989) ("Administrative interpretation and implementation of a regulation are, of course, highly relevant to our analysis, for '[i]n evaluating a facial challenge to a state law, a federal court must ... consider any limiting construction that a state court or enforcement agency has proffered.' ") (quoting *Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 495 n. 5, 102 S.Ct. 1186 1191 n. 5, 71 L.Ed.2d 362 (1982)); *Grayned,* 408 U.S. at 110, 92 S.Ct. at 2300 ("Here, we are 'relegated, ... to the words of the ordinance itself,' to the interpretations the court be-

16. It is interesting to note that this case was originally filed in state court; the City chose to remove it to a federal forum. Neither side requested certification of any issue to the Maryland Court of Appeals.

low has given to analogous statutes, and, perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it.") (internal citations omitted).

The City, however, has not offered any state court opinions, administrative materials, or other interpretations of the ordinance outside of its memoranda in this case.[17] The court has found no case in which such papers have been deemed to be an "authoritative" interpretation of a statute. The court finds, therefore, that the City's assertion in its summary judgment memorandum that it will enforce the ordinance as if it contained an explicit mens rea requirement is insufficient to support an authoritative finding that the ordinance requires specific intent. *See City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 770, 108 S.Ct. 2138, 2151, 100 L.Ed.2d 771 (1988)[18]; *Hynes,* 425 U.S. at 622 n. 6, 96 S.Ct. at 1761 n. 6 ("The agency charged with enforcement, the police department, has not adopted any regulations that would give more precise meaning to the ordinance if indeed it has the legal power to do so.").

The court, therefore, concludes that the ordinance lacks a specific intent requirement. That determination leads the court to find in the following sections that the ordinance is unconstitutionally vague and overbroad.

## II. Vagueness

As the Supreme Court recently made clear, "[v]agueness may invalidate a criminal law for either of two independent reasons. First, [the statute] may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." *Morales,* 527 U.S. at 56, 119 S.Ct. at 1859 (citing *Kolender,* 461 U.S. at 357, 103 S.Ct. at 1858). *See also Ashton v. Brown,* 339 Md. 70, 660 A.2d 447, 456 (1995). "[T]he more important aspect of the vagueness doctrine 'is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.' " *Kolender,* 461 U.S. at 357–58, 103 S.Ct. 1855 (quoting *Smith v. Goguen,* 415 U.S. 566, 574, 94 S.Ct. 1242, 1247–48, 39 L.Ed.2d 605 (1974)). *See also Morales,* 527 U.S. at 65, 119 S.Ct. at 1863 (O'Connor, J. concurring) (same). For the reasons discussed below, the court must conclude that the City ordinance is unconstitutionally vague.[19]

17. In response to a question at oral argument, the city attorney submitted a letter to the court explaining that his office has issued no "written opinion regarding the mens rea element." (Letter from Paul Garvey Goetzke, Feb. 2, 2001.) Assuming for the sake of argument that the city attorney could issue an interpretation of a criminal ordinance that would bind the city police, he has not done so in this case. (*See* City's Reply and Opp., Ex. I, Annapolis City Code § 2.12.040.)

18. The court finds the Supreme Court's reasoning in *Lakewood* particularly instructive. In that case, the Court wrote that:

> The city asks us to presume that the mayor will deny a permit application only for reasons related to the health, safety, or welfare of Lakewood citizens, and that additional terms and conditions will be imposed only for similar reasons. This presumes the mayor will act in good faith and adhere to standards absent from the ordinance's face. But this is the very presumption that the

> doctrine forbidding unbridled discretion disallows.... The doctrine requires that the limits the city claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice.... This Court will not write nonbinding limits into a silent state statute.

486 U.S. at 770, 108 S.Ct. at 2151 (internal citations omitted). For those same reasons, the City's assertions in its memoranda cannot, by themselves, constitute an authoritative or binding interpretation of the ordinance.

19. In so doing, the court is fully mindful of the Fourth Circuit's admonition that "[s]triking down ordinances ... as facially void for vagueness is a disfavored judicial exercise." *Schleifer,* 159 F.3d at 853. Interestingly, in *Schleifer,* the court noted that "[a] scienter requirement might serve a beneficial narrowing function if [the section of the challenged ordinance] *imposed* criminal liability," rather

The plaintiffs attack several sections of the ordinance as impermissibly vague. First, they contend that three features of section D.1 violate the requirements explained above. Specifically, they challenge the phrase "making hand signals associated with drug related activity," which appears twice in section D.1, and the "catch-all" provision, which permits an officer to order a person to move on if he is "engaging in a pattern of any other conduct normally associated by law enforcement agencies with the illegal distribution, purchase or possession of drugs." The plaintiffs argue that these phrases are unconstitutionally vague because they allow a police officer unfettered discretion and do not provide adequate guidance to residents.

The City bases much of its defense against these challenges on the presumption that the ordinance includes a specific intent requirement. Thus, the City argues that section D.1 does not allow police officers excessive discretion because an officer can only order a person to move on if that person is loitering with the intent to participate in drug-related activity. (Mem. Sup. Mot. for Sum. Jud. at 19–20.) Likewise, the City contends that the section provides adequate notice because residents will know that they can be prosecuted only if they engage in the listed activities with the required intent. (*Id.*) The court's conclusion that the ordinance does not contain a specific intent requirement renders these arguments unpersuasive. It also highlights the fact that, in general, only those anti-loitering ordinances interpreted as including a specific intent requirement have been upheld against both prongs of a vagueness challenge. *See Luvene,* 827 P.2d at 1384–86; *Ellison,* 68 Cal.App.4th at 209–210, 80 Cal.Rptr.2d 120. In contrast, anti-loitering ordinances that do not contain a mens rea element generally have been invalidated as unconstitutionally vague. *See, e.g., Rowland,* 618 N.E.2d at 148; *Muschkat,* 706 So.2d at 435; *Wyche,*

619 So.2d at 235; *Coleman,* 364 S.E.2d at 243–44. *See also Morales,* 527 U.S. at 55, 119 S.Ct. at 1858 (stating that the ordinance is too vague because "[i]t is a criminal law that contains no mens rea requirement, and infringes on constitutionally protected rights") (citations omitted); *Johnson v. Carson,* 569 F.Supp. 974, 980–81 (M.D.Fla.1983).

Like other anti-loitering ordinances without mens rea requirements, the City's ordinance is unconstitutionally vague. The Annapolis ordinance makes no effort to define either "hand signals associated with drug related activity," or a "pattern of . . . conduct normally associated by law enforcement agencies with the illegal distribution, purchase or possession of drugs." Rather, it leaves those determinations entirely to the police officer. In so doing, the ordinance fails both to provide adequate warning to the "ordinary citizen to [enable him] to conform his or her conduct to the law," and to "establish minimal guidelines to govern law enforcement." *See Morales,* 527 U.S. at 60–61, 119 S.Ct. at 1860–61 (citations omitted). A private citizen would have no reason to know what conduct might be "normally associated by law enforcement agencies with the illegal distribution, purchase or possession of drugs" or which "hand signals" are "associated with drug related activity." Moreover, without a specific definition of that conduct, the ordinance "entrusts lawmaking to the moment-to-moment judgment of the policeman on his beat." *Kolender,* 461 U.S. at 360, 103 S.Ct. at 1859–60 (internal quotation omitted). Accordingly, the court concludes that the references to "hand signals associated with drug related activity," and a "pattern of . . . conduct normally associated by law enforcement agencies with the illegal distribution, purchase or possession of drugs" in section D.1 are unconstitutionally vague.

In addition to challenging the activities described in section D.1, the plaintiffs also allege that several other specific phrases

than creating an exception to prosecution un- der the ordinance. 159 F.3d at 853 n.

and provisions of the ordinance are unconstitutionally vague.[20] First, the plaintiffs contend that the ordinance does not inform a person what he must do to comply with an order to "move on"; nor does it provide a police officer with any guidelines to be used in determining if a person has complied with his order. (Pl.s' Opp. and Cross–Mot. at 34–35.) In support of this argument, the plaintiffs quote Justice Stevens' opinion in *Morales:*

> the terms of the dispersal order compound the inadequacy of the notice afforded by the ordinance. It provides that the officer "shall order all such persons to disperse and remove themselves from the area." ... This vague phrasing raises a host of questions. After such an order issues, how long must the loiterers remain apart? How far must they move? If each loiterer walks around the block and they meet again at the same location, are they subject to arrest or merely to being ordered to disperse again?...
>
> Lack of clarity in the description of the loiterer's duty to obey a dispersal order might not render the ordinance unconstitutionally vague if the definition of the forbidden conduct were clear, but it does buttress our conclusion that the entire ordinance fails to give the ordinary citizen adequate notice of what is forbidden and what is permitted.

527 U.S. at 59–60, 119 S.Ct. at 1860–61. In response, the City cites to the Court's opinion in *Colten v. Kentucky,* in which it upheld a statute that "authorized conviction for refusing to disperse with the intent of causing inconvenience, annoyance, or alarm." 407 U.S. 104, 110, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584 (1972). The City argues that Justice Stevens' opinion in *Morales* cannot be read to overrule *Colten* because only two other Justices joined that section of the plurality opinion.

*Cf. Morales,* 527 U.S. at 50 n. 9, 119 S.Ct. at 1855 n. 9 (Scalia, J. dissenting) ("The plurality purports to distinguish its sweeping condemnation of dispersal orders from *Colten* ..., but I see no principled ground for doing so. The logical implication of the plurality's assertion is that the police can never issue dispersal orders.").

The court cannot conclude that Justice Stevens' opinion mandates a finding that the failure to define "move on" renders that term unconstitutionally vague. As in *Morales,* however, however, that failure does reinforce the conclusion that the ordinance as a whole fails the vagueness analysis. The ordinance does not specify to where a person who has been so ordered must move or for how long he must remain at that place. It, therefore, may allow a police officer too much discretion by permitting her to require different people to move on to different places or for different amounts of time. Second, it may not adequately notify citizens as to what they must do to avoid arrest after being ordered to move on. Thus, it exacerbates the lack of a specific intent requirement in the ordinance.

The plaintiffs also contend that section D.3 is unconstitutionally vague because it allows an officer to issue an order to move on to a "known unlawful drug user, possessor, seller or buyer [who] is currently subject to a judicial order prohibiting his/her presence in a high drug activity geographic area" without defining the term "high drug activity geographic area." While the undefined term is troubling, the ordinance does not purport to be the source of the court's power to issue such an order. Nor does it define the circumstances in which such an order may be made. Thus, this court is not in a position to evaluate the state court's authority to issue orders prohibiting a person's "presence in a high drug activity geographic area."[21] The

---

**20.** The plaintiffs do not argue that the term "loiter" is unconstitutionally vague even though it is not defined in the ordinance, or elsewhere in the Annapolis City Code. The

court, therefore, does not address this question.

**21.** The plaintiffs note that the phrase "high drug activity geographic area" does not ap-

court, therefore, will not conclude on this record that section D.3 is unconstitutionally vague.

Finally, the plaintiffs allege that section B.1, which permits "[a] neighborhood association [to] apply to have its neighborhood designated a Drug–Loitering Free Zone," is unconstitutionally vague because the term "neighborhood" is not defined. (Pl.s' Opp. and Cross–Mot. at 33–34.) That term, however, is used solely in the section permitting the designation of areas as Drug–Loitering Free Zones; it, therefore, is subject to clarification during the application process. Indeed, each of the applications provided as exhibits by the plaintiffs contains a map and written description of the area to be designated. (*Id.*, Ex. G, H.) Thus, the parameters of the "neighborhood" to be designated a Drug–Loitering Free Zone are defined in the application. Once designated, the area will be delineated with signs to provide notice to persons who might be loitering therein. The area in which the ordinance precludes loitering is, therefore, adequately defined. A specific definition of the term "neighborhood" is not required.

For the foregoing reasons, the court concludes that section D.1 of the ordinance is unconstitutionally vague, and the plaintiffs' motion for summary judgment should be granted.

### III. Overbreadth

■ Although the "elements of First Amendment overbreadth analysis are familiar," *Houston v. Hill*, 482 U.S. 451, 459, 107 S.Ct. 2502, 2508, 96 L.Ed.2d 398

(1987), the Supreme Court has stated that, in this context, "[i]t remains a 'matter of no little difficulty' to determine when a law may properly be held void on its face and when 'such summary action' is inappropriate." *Broadrick*, 413 U.S. at 615, 93 S.Ct. at 2917 (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 617, 91 S.Ct. 1686, 1689, 29 L.Ed.2d 214 (1971) (opinion of Black, J.)). *See also City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1984) ("The concept of "substantial overbreadth" is not readily reduced to an exact definition.. It is clear, however, that the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge."). Rather, "[o]nly a statute that is substantially overbroad may be invalidated on its face." *Hill*, 482 U.S. at 459, 107 S.Ct. at 2508. Thus, "[i]n addressing such a facial overbreadth challenge, a court's first task is to ascertain whether the enactment reaches a substantial amount of constitutionally protected conduct." *Boos*, 485 U.S. at 329, 108 S.Ct. at 1168. *See also Hoffman Estates*, 455 U.S. at 494, 102 S.Ct. at 1191.

■ Further, "particularly where conduct and not merely speech is involved, . . . the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick*, 413 U.S. at 615, 93 S.Ct. at 2918.[22] *See also Morales*, 527 U.S. at 52, 119 S.Ct. at 1857 ("the overbreadth doctrine permits the facial in-

---

pear anywhere in the Annapolis City Code. (Pl.s' Opp. and Cross–Mot. at 31.) The court is sympathetic to this argument, but concludes that a state court's authority to issue such an order cannot be challenged in this suit. Rather, an order precluding a person from entering such an area could be challenged as vague when issued. This conclusion also forecloses the plaintiffs' contention that a person subject to judicial order precluding his presence in a "high drug activity geographic area" will not be aware that he

must not loiter in a Drug–Loitering Free Zone. (*Id.* at 32.) That argument is properly made as a challenge to the judicial order, not as a challenge to this ordinance.

**22.** The plaintiffs do not contend that the ordinance infringes solely pure speech. Rather, the protected activities they claim are precluded by the ordinance involve both speech and conduct. (Pl.s' Opp. and Cross–Mot. at 18.)

validation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.' ") (quoting *Broadrick,* 413 U.S. at 615, 93 S.Ct. at 2918); *U.S. v. Mento,* 231 F.3d 912, 921 (4th Cir.2000) ("In order for a statute to be invalidated on its face, its overbreadth must be real and substantial when judged in relation to the statute's plainly legitimate sweep.") (citation omitted). Thus, once it has determined whether the ordinance impacts a substantial amount of constitutionally protected conduct, the court must judge that infringement against the legitimate scope of the ordinance to determine if it is impermissibly overbroad.[23]

■■■ The plaintiffs contend that section D.1 of the ordinance is overbroad because it "criminalizes speech and behaviors that on their face are innocuous." (Pls' Opp. and Cross–Mot. at 17.) In support of this argument, the plaintiffs list a series of activities that, although not drug-related, may trigger an order to move on (e.g., "making change," "selling lawful goods," "flag[ing] down motorists for a charity car wash," "conducting voter registration drives," "soliciting contributions"). (*Id.* at 18.) They claim that, because those activities are constitutionally protected, the ordinance is impermissibly overbroad.

Much of the City's defense against this allegation is premised on its contention that section D contains a specific intent requirement; it argues that the ordinance is not overbroad because it affects only conduct undertaken with the intent participate in drug-related activity. (Mem. Sup. Mot. for Sum. Jud. at 13–17.) Indeed, courts that have evaluated similar ordinances have concluded that "[a]n ordinance that prohibits loitering may survive an overbreadth challenge if the enactment re-

quires scienter or specific intent to engage in an illicit act." *City of Alexandria,* 747 F.Supp. at 326–27. *See also Luvene,* 827 P.2d at 1383 ("As a general matter, an ordinance may survive an overbreadth challenge if it requires the specific intent to engage in an illicit act."). Because the court has found that the ordinance lacks a mens rea element, however, the City's argument cannot prevail. Moreover, while the absence of a mens rea element is not sufficient, by itself, to justify a ruling that the ordinance is overbroad, it strongly supports such a conclusion.

The City also argues that many of the activities listed by the plaintiffs as potentially triggering an order to move on are not protected by the First Amendment. Specifically, it contends that there is no protected right to "cower in a corner" or to "engage in 'social' expression or association." (City's Reply at 16.) Other courts that have analyzed similar statutes have rejected this argument. *See, e.g., Sawyer v. Sandstrom,* 615 F.2d 311, 315–318 (5th Cir.1980); *City of Alexandria,* 747 F.Supp. at 327–28; *Rowland,* 618 N.E.2d at 148–49; *Carson,* 569 F.Supp. at 978; *Muschkat,* 706 So.2d at 435–36; *Wyche,* 619 So.2d at 235; *Coleman,* 364 S.E.2d at 243. Like the ordinance at issue in *City of Alexandria,* the Annapolis ordinance criminalizes a substantial amount of protected activity. *See City of Alexandria,* 747 F.Supp. at 328 ("[b]y equating unlawful purpose with seven innocent activities that may be accomplished by persons lacking unlawful intent, the ... ordinance criminalizes a substantial amount of constitutionally protected activities.") (citing *Sawyer,* 615 F.2d at 317). *See also Kolender,* 461 U.S. at 358 n. 8, 103 S.Ct. at 1859 n. 8.

Without a specific intent requirement, the language of the ordinance would subject persons participating in such clearly protected activities as voter-registration

23. The plaintiffs also must show that an ordinance impacts a substantial amount of protected speech relative to its legitimate scope to have standing to assert a facial challenge on overbreadth grounds. Thus, the analysis undertaken in this section determines both

that the plaintiffs succeed on their overbreadth challenge and that they had standing to assert it in the first instance. *See, e.g., Vincent,* 466 U.S. at 798–801, 104 S.Ct. at 2125–27.

drives to orders to move on. Further, whatever impact the ordinance would have on speech and conduct would take place on the sidewalks and streets in the designated Drug–Loitering Free Zones. Those areas are public fora, where government regulation is "subject to the highest scrutiny." *International Society for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 678, 112 S.Ct. 2701, 2705, 120 L.Ed.2d 541 (1992); *see also id.* at 696, 112 S.Ct. at 2717 (Kennedy, J. concurring) ("The types of property that we have recognized as the quintessential public forums are streets, parks, and sidewalks.").

Having concluded that the ordinance impacts a substantial amount of protected activity, the court examines its legitimate scope. First, the City certainly has a legitimate interest in protecting its citizens from the dangers of drug trafficking. It is unclear, however, what the ordinance would add to the drug and loitering laws already in place even if it did contain a specific intent requirement. Indeed, the ordinance was passed only by a 5–4 vote of the city council and against the recommendation of the Public Safety Committee. In its written recommendation, the Public Safety Committee opined that the ordinance was unnecessary because "public safety is best enhanced" by enforcing the drug trafficking laws already in existence. (Pl.s' Opp. and Cross–Mot., Ex. C.) Further, Alderman Gilmer stated at a city council meeting that the chief of police did not support the ordinance and, indeed, thought it unnecessary. (*Id.,* Ex. D.)

The court's finding that several of the phrases contained in section D.1 are un-

constitutionally vague further restricts the legitimate scope of the ordinance. Likewise, the lack of a specific intent requirement heightens the discrepancy between the ordinance's legitimate scope and its intrusion on protected activities by increasing the likelihood that residents will be ordered to move on or arrested for conduct not related to drug trafficking. Thus, the ordinance both infringes substantial protected rights and has a relatively small legitimate scope. *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960) ("Even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle personal liberties when the end can be more narrowly achieved."). Accordingly, the court finds the ordinance substantially overbroad. Thus, although "[a]pplication of the overbreadth doctrine in this manner is, manifestly, strong medicine," *Broadrick,* 413 U.S. at 613, 93 S.Ct. at 2916, the court finds it applicable to the Annapolis ordinance. Accordingly, it will grant the plaintiffs' motion for summary judgment on these grounds.

### IV. Substantive Due Process and Impermissible Delegation

Because the court concludes that the ordinance is unconstitutionally vague and overbroad, it will not decide the substantive due process and non-delegation claims.[24],[25]

### V. Conclusion

In summary, the court finds that the plaintiffs, both those individually named

---

**24.** Although the issue was not raised by the parties, the court recognizes the principle of judicial restraint recently restated by the Fourth Circuit in *Bell Atlantic Maryland, Inc. v. Prince George's County,* which counsels against deciding "constitutional questions unless they are essential to the disposition of a case." 212 F.3d 863, 865 (4th Cir.2000). *See also Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 346–47, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936) (Brandeis, J. concurring). In this regard, the court notes that the first three claims raised by the plaintiffs—vagueness, overbreadth, and substantive due pro-

cess—indisputably require it to resolve federal constitutional issues. In their fourth Count, however, the plaintiffs, in addition to asserting a violation of the federal Due Process Clause, claim that the delegation of legislative authority violates the Maryland Constitution and Code as well as the Annapolis City Charter. The court, therefore, is bound to examine the Count carefully to determine if it might be able to resolve the plaintiffs' contentions without reaching federal constitutional issues. *See Lowe v. SEC,* 472 U.S. 181, 190, 105 S.Ct. 2557, 2563, 86 L.Ed.2d 130 (1985)

and the NAACP as a representative of its members, have demonstrated standing to challenge the constitutionality of the ordinance. Second, the court concludes that, by its plain language, the ordinance does not include a specific intent requirement; further, this court cannot construe the ordinance as requiring specific intent. Accordingly, for the reasons stated above, the court finds that the ordinance is both unconstitutionally vague and overbroad.[26] A separate Order follows granting declaratory and injunctive relief.

## ORDER

For the reasons stated in the accompanying Memorandum, it is hereby **ORDERED** that:

1. The plaintiffs' motion for summary judgment is **granted**;

2. The defendant's motion for summary judgment is **denied**;

3. Annapolis Ordinance No. 0–19–99 is **declared** unconstitutional and the City is **permanently enjoined** from enforcing it;

4. The Clerk shall **CLOSE** this case; and

5. Copies of this Order and the accompanying Memorandum shall be mailed to counsel of record.

("[A] careful study of the statute may either eliminate, or narrowly limit, the constitutional question that we must confront.").

Initially, the court notes that because the ordinance was passed by the Annapolis City Council, which receives its home rule authority from the Maryland Constitution, it could not attempt any direct delegation of federal legislative authority. *See Geo–Tech Reclamation Services, Inc. v. Hamrick*, 886 F.2d 662, 666 n. 2 (4th Cir.1989) ("We do not suggest that federal law places any general restraints on the delegation of state power to state administrators or generally requires state power to be delegated according to well defined standards.") Further, however, the court notes the Seventh Circuit's ruling in *United Beverage Co. of South Bend, Inc. v. Indiana Alcoholic Beverage Comm'n*, 760 F.2d 155 (1985). In that case, Judge Posner wrote that although "there is no independent federal constitutional doctrine of excessive delegation of state legislative power ... such a doctrine is sometimes used as an ancillary protection for free speech and other specific rights that the Constitution protects." *See also Geo–Tech*, 886 F.2d at 666 n. 2 (citing *Beverage Co.* for the proposition that there exist "a few limited areas where constitutional interests require state regulatory power to be exercised according to clearly articulated standards"). Because the ordinance at issue in this case may infringe First Amendment rights, the delegation of state legislative authority raises federal constitutional concerns. The rule espoused in *Ashwander* and *Bell Atlantic*, therefore, does not require the court to resolve this count in advance of the overbreadth, vagueness, or substantive due process claims.

25. The court notes that if an application is properly filed from an area in which there have been three or more drug arrests in the preceding twenty-four months, the ordinance requires that the city council "shall" designate the area a Drug–Loitering Free Zone. (Ordinance § B.3.) There is, therefore, no mechanism by which the city council may deny the application or consider any opposition that might be voiced by neighboring residents or property owners. To the extent that provision may impermissibly delegate legislative authority, it might be remedied simply by changing the word "shall" to "may" in section B.3 and/or by providing for a public hearing

26. In the event that the court found certain words or phrases in the ordinance unconstitutional, the City asked it to strike those words or phrases and leave intact the remainder of the ordinance. (City's Reply at 18–20.) The general rule in Maryland is that "[w]hen the dominant purpose of an enactment may largely be carried out notwithstanding the statute's partial invalidity, courts will generally hold the valid portions severable and enforce them." *O.C. Taxpayers for Equal Rights, Inc. v. Mayor and City Council of Ocean City*, 280 Md. 585, 375 A.2d 541, 550 (1977). *See also Board of Supervisors of Elections of Anne Arundel County v. Smallwood*, 327 Md. 220, 608 A.2d 1222, 1234–35 (1992). In this case it is unreasonable to think that the city council would have instituted the ordinance without section D.1. Because the dominant purpose of the ordinance could not be carried out in the absence of that section, the court must hold the ordinance unconstitutional in its entirety.