OPINION
{¶ 1} Defendant-appellant Richard Davis appeals his conviction and sentence from the Stark County Court of Common Pleas on one count of illegal assembly or possession of chemicals for the manufacture of drugs. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On April 3, 2003, the Stark County Grand Jury indicted appellant on one count of illegal assembly or possession of chemicals for the manufacture of drugs in violation of R.C. 2925.04.1(A),[1] a felony of the third degree. At his arraignment on April 4, 2003, appellant entered a plea of not guilty to the charge contained in the indictment.
 {¶ 3} Thereafter, a jury trial commenced on May 14, 2003. The following testimony was adduced at trial.
 {¶ 4} On February 24, 2003, Patrolman Steven Minich of the Alliance Police Department went to serve an arrest warrant on Gregory Croley at his residence, which is located at 1856 So. Freedom in Alliance. In addition to Croley, Roberta Taylor, Croley's girlfriend, resided in the residence along with Croley's daughter and Taylor's two daughters. The arrest warrant was for failure to pay fines and costs on a DUI charge. Upon arriving at the above address, Patrolman Minich observed a van belonging to appellant, who had been staying at the Croley residence, and observed two one-gallon cans of Coleman fuel and a round tube containing non-iodized salt inside the van. When asked if, at some further point in time, he found anything else in appellant's van, the patrolman testified that "there is a pouch behind the driver's seat, inside that pouch was approximately 30 feet of clear plastic tubing." Transcript Vol. II at 40.
 {¶ 5} Based upon his training with the Drug Enforcement Agency and his experience as a police officer, the patrolman believed that the above items were to be used to manufacture methamphetamine. During a later search of the Croley residence, a "gas generator" was found on the northeast corner of the garage. According to Patrolman Minich, the generator consisted of a two-liter bottle with clear plastic tubing coming out of it that is used in the manufacture of methamphetamine. The patrolman further testified that the tubing attached to the bottle appeared to be identical to the tubing found in appellant's van. During the search of the Croley residence, Epsom salt was found in a cupboard in a bathroom off of the kitchen and an Altoids mint tin was found in a bedroom. When questioned about whether Epsom salt caused him any reason for concern or suspicion, Patrolman Minich indicated that it was "another key ingredient in the manufacture of methamphetamine." Transcript Vol. II at 46. No camping equipment was found in appellant's truck or in the residence.
 {¶ 6} Detective David Bair of the Alliance Police Department was the next witness to testify at trial. Detective Bair, who is with the special investigations unit, testified that he has been involved in approximately 10 to 15 investigations involving methamphetamines and that he has had training with regard to methamphetamine and its production from the Drug Enforcement Agency. The following testimony was adduced when Detective Bair was asked how methamphetamine is produced and how it is usually produced in Alliance, Ohio:
 {¶ 7} "A. Methamphetamines, what we find in Alliance, there is several ways, but the way that is commonly — has been found in Alliance is called the crockpot method or the Alliance, Ohio method as our local DA likes to call it. And what it consists of is basically household chemicals that are mixed together and react within themselves and they boil down to a methamphetamine base. Specifically, if I can, if I may —
 {¶ 8} "Q. Sure, just take us through the process as you understand it.
 {¶ 9} "A. It starts off with you take a Coleman fuel, Coleman camping fuel, and you mix in Epsom salts. And, to my knowledge, the Epsom salts, I'm not a scientist, but I believe may absorb any impurities that may be in the camping fuel. Then you take 800 Sudafed tablets, four lithium batteries, and you peel them apart, you don't take the whole lithium battery, Coleman camping fuel and hydrous ammonia, take a glass container and all these chemicals and the pills, after they're crushed, are mixed together. A chain reaction within the chemical starts happening and it basically boils down. It's called the cook pot. It actually cooks like a crockpot over a period of 12 hours.
 {¶ 10} "When that is done it is then filtered because you have all the pill waste and everything, and the lithium in there. That is then filtered through coffee filters which leaves what they call a meth base or a meth oil.
 {¶ 11} "The final stage is you take a — the ones in Alliance, they take a plastic two liter bottle, inside the two liter bottle they would mix noniodized salt and liquid fire or sulfuric acid. They would pour that in there, they would take the cap from the two liter bottle and they would put a tube running out of the cap, okay, and then they would tape that all off.
 {¶ 12} "The tube would then — once the sulfuric acid and the salt get together, it starts forming a hydrochloric gas. It is then put into the meth oil and it's called gassing or smoking it, and it begins crystallizing the liquid.
 {¶ 13} "And after that it doesn't become totally crystallized, becomes almost like an oatmeal, and that is strained through coffee filters and left to dry. And once that is dried that is your crystal meth, that is what you cook — or that is what you smoke or ingest into your body.
 {¶ 14} "Q. You say you smoke it. Is there other ways to ingest this crystal meth?
 {¶ 15} "A. Yes. You can smoke it, you can mix it with — it's water soluble. You can mix it with water and drink it, you can inject it with water and drink it, you can inject in into your veins." Transcript Vol. II at 65-67.
 {¶ 16} The Detective further testified that Epsom salt, plastic tubing and Coleman fuel all are used in the manufacture of methamphetamine, that he has seen such items at "every scene that I've gone to," and that a "gas generator" such as one found at the scene is indicative of methamphetamine production. Transcript Vol. II at 72, 73. A videotape of the generator at the location where it was discovered was introduced at trial since the same had been taken by a clean up crew pursuant to Drug Enforcement Agency requirements.
 {¶ 17} According to Detective Bair, there were other drug busts involving methamphetamines that occurred in the City of Alliance during the weeks prior to the incident in this case. The Detective further testified that there were newspaper articles in the Alliance Review during February of 2003 about "the drug busts prior to February 24th of 2003." Transcript Vol. II at 80. The articles, according to Detective Bair, listed ingredients and methods for making methamphetamine.
 {¶ 18} Detective James Hilles of the Alliance Police Department participated in the search of the Croley residence and yard. Detective Hilles testified that he personally found the "gas generator" behind the garage under some snow and that such generators are commonly used in methamphetamine production. The Detective further testified that a glass vial and a plastic baggy were found on a bed in the bedroom of Greg Croley and Roberta Taylor. According to Detective Hilles, when appellant was questioned about the items found in his van, appellant indicated that he had the non-iodized salt "because I eat" and that he was taking the tubing to his brother for his brother's aquarium. Transcript Vol. II at 98, 99. When Detective Hilles indicated that appellant had the items for methamphetamine production, appellant stated that "it takes a lot more than that to make methamphetamine." Transcript Vol. II at 100. Ten minutes earlier, appellant had stated to the Detective that he did not know anything about methamphetamine production.
 {¶ 19} At trial, Greg Croley testified that appellant had been living with him for about five days before appellant's arrest. While admitting that he had used methamphetamine in the past with appellant and others, Croley denied that he ever had produced the same. When asked whether he had any knowledge as to how methamphetamine is made, Croley responded that his only knowledge came through newspapers and the Internet and that he had seen a list of ingredients in the newspaper. Croley further testified that since a lot of people, including some of his acquaintances, had been busted in Alliance for methamphetamine production, he told appellant that "I don't' want anything in my house that's illegal." Transcript Vol. II at 125. According to Croley, appellant previously had "mentioned, . . . making it [methamphetamine] again." Transcript Vol. II at 126. Croley further testified that he did not have any camping equipment in his house. Croley was arrested on February 24, 2003, along with appellant and Roberta Taylor and subsequently pled guilty to possession of drug paraphernalia. According to Croley, while he was being transported to court with appellant, appellant "just told me to keep quiet and they can't prove this." Transcript Vol. II at 138.
 {¶ 20} Roberta Taylor, Croley's girlfriend, also testified at trial. Taylor, who also was arrested on February 24, 2003 and later pled guilty to possession of drug paraphernalia, testified that appellant had been "popping out pills" and putting them in a bowl the evening before. Transcript Vol. II at 157. According to Taylor, there was a "large quantity of pills." Id. Taylor then called her boyfriend and told him "to get them out of my house." Transcript Vol. 11 at 158. Taylor further testified that she had used methamphetamine before with appellant and Croley, but that she had never made any. When questioned, Taylor testified that she heard appellant say that "he was going to make a batch [of methamphetamine]" Transcript Vol. II at 161. The following testimony was adduced when Taylor was asked whether appellant made any statements to her, either back and forth to court or at court:
 {¶ 21} "A. As long as I keep my mouth shut the charges will be dropped because there's not enough evidence.
 {¶ 22} "Q. Did he tell you what you were supposed to not talk about?
 {¶ 23} "A. No. He just said as long as I keep my mouth shut that the charges will be dropped because there's not enough evidence.
 {¶ 24} "Q. Did you tell him anything as a result of that?
 {¶ 25} "A. I believe I said I wasn't taking the rap for him. I mean, I wasn't going to keep my mouth shut for something that I didn't do." Transcript Vol. II at 161-162.
 {¶ 26} The State's last witness, Jay Spencer, a criminalist with the Canton-Stark County Crime Lab, testified that traces of methamphetamine were found inside the Altoids tin. He also testified that traces of methamphetamine and cocaine were found inside the glass vial and that traces of methamphetamine were in the residue in the plastic baggy, both of which were found in the bedroom. Spencer's description of methamphetamine production was similar to that testified to at length by Detective Bair.
 {¶ 27} At the conclusion of the evidence and the end of deliberations, the jury, on May 16, 2003, found appellant guilty of illegal assembly or possession of chemicals for the manufacture of drugs. As memorialized in a Judgment Entry filed on May 20, 2003, appellant was sentenced to four years in prison. The trial court, in its entry, ordered that appellant's sentence be served concurrently with appellant's sentence in another Stark County case.
 {¶ 28} Appellant now raises the following assignments of error on appeal:
 {¶ 29} "I. THE COURT ERRED IN NOT GRANTING THE DEFENSE MOTION FOR A MISTRIAL, RESULTING FROM THE STATE'S FAILURE TO COMPLY WITH CRIMINAL RULE 16 AS IT RELATES TO DISCOVERY.
 {¶ 30} "II. THE COURT ERRED IN PERMITTING HEARSAY TESTIMONY OFFERED BY WITNESSES PERTAINING TO INFORMATION THE WITNESSES OBTAINED FROM NEWSPAPER ARTICLES IN VIOLATION OF OHIO RULES OF EVIDENCE, RULE 801 AND THE DEFENDANT-APPELLANT'S SIXTH AMENDMENT RIGHT TO CONFRONT HIS ACCUSERS.
 {¶ 31} "III. THIS COURT ERRED IN NOT GRANTING THE DEFENDANT-APPELLANT'S CRIMINAL RULE 29(A) MOTION FOR ACQUITTAL.
 {¶ 32} "IV. THE COURT ERRED IN OVERRULING THE DEFENDANT-APPELLANT'S MOTION TO DISMISS THE INDICTMENT DUE TO VAGUENESS AND OVERBREADTH OF R.C. SEC. 2925.04(A)(1) IN VIOLATION OF THE FIRST ANDFOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.
 {¶ 33} "V. THE COURT ERRED BY NOT REQUIRING THE STATE TO PROVIDE THE DEFENDANT-APPELLANT THE STATEMENTS OF THE CO-DEFENDANTS ROBERTA TAYLOR AND GREG CROLEY."
 I {¶ 34} Appellant, in his first assignment of error, argues that the trial court erred in denying appellant's motion for a mistrial due to the State's failure to comply with Crim.R. 16. Appellant specifically contends that he was entitled to a mistrial since the State failed to disclose videotapes from the Alliance Police Department booking room which "included statements of the Defendant-Appellant and/or co-defendant Croley."[2]
 {¶ 35} Mistrials need to be declared only when the ends of justice so require and a fair trial is no longer possible. State v. Franklin
(1991), 62 Ohio St.3d 118, 127, 580 N.E.2d 1. The standard of review for evaluating a trial court's decision to grant or deny a mistrial is abuse of discretion. State v. Sage (1987), 31 Ohio St.3d 173, 182,510 N.E.2d 343. An abuse of discretion connotes more than an error of law or judgment. It implies that the trial court ruled arbitrarily, unreasonably, or unconscionably. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 450 N.E.2d 1140.
 {¶ 36} Appellant, in the case sub judice, sought a mistrial due to the State's failure to comply with Crim. R. 16.
 {¶ 37} Pursuant to Crim. R. 16, the prosecutor is under a duty to disclose evidence favorable to a defendant. The rule provides, in pertinent part as follows:
 {¶ 38} "(B) Disclosure of evidence by the prosecuting attorney
 {¶ 39} "(1) Information subject to disclosure.
 {¶ 40} "(a) Statement of defendant or co-defendant. Upon motion of the defendant, the court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph any of the following which are available to, or within the possession, custody, or control of the state, the existence of which is known or by the exercise of due diligence may become known to the prosecuting attorney:" . . .
 {¶ 41} "i) Relevant written or recorded statements made by the defendant or co-defendant, or copies thereof."
 {¶ 42} Criminal Rule 16(E)(3) provides for the regulation of discovery and permits a trial court to exercise discretion in selecting the appropriate sanction for a discovery violation. See State v. Wiles
(1991), 59 Ohio St.3d 71, 78, 571 N.E.2d 97, and State v. Parson (1983),6 Ohio St.3d 442, 453 N.E.2d 689. Crim.R. 16(E)(3) provides that: "If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances."
 {¶ 43} Ordinarily, a trial court must impose the least severe sanction for a discovery violation that is consistent with the purposes of the rules of discovery. City of Lakewood v. Papadelis (1987), 32 Ohio St.3d 1,511 N.E.2d 1138, syllabus. In State v. Joseph, 73 Ohio St.3d 450, 458,1995-Ohio-288, 653 N.E.2d 285, the Ohio Supreme Court articulated the standard for reversals in the context of discovery violations, stating that: "Prosecutorial violations of Crim.R. 16 are reversible only when there is a showing that (1) the prosecution's failure to disclose was a willful violation of the rule, (2) foreknowledge of the information would have benefited the accused in the preparation of his defense, and (3) the accused suffered some prejudicial effect." Id., citing Parson, supra at 445.
 {¶ 44} In the case sub judice, there is no dispute that the State did not disclose the videotapes as part of discovery even though appellant had requested "all relevant written statements made by a defendant or co-defendant" in his request for discovery. The record reveals that when Detective Hilles came into court on the morning of May 15, 2003, he brought with him two videotapes from the Alliance Police Department booking room that purportedly show appellant and Greg Croley whispering back and forth. The State did not become aware of such tapes until after jury selection, but before opening statements, on such date and disclosed the same promptly to defense counsel. The trial court addressed such videotapes on the record as follows:
 {¶ 45} "Very well. Before I call upon you, Mr. Mackey, I do want to note for the record that at approximately 8:45 this morning the Court did have the opportunity to meet with Attorney Mackey, Attorney Wise, and also Attorney Chryssa Hartnett, who is also an employee of the Stark County Prosecutor's office.
 {¶ 46} "At the conclusion of that in-chambers conference, and I don't have the exact time on that, but I think it was probably about 9:45 or so, the Court cleared the courtroom with the exception of Mr. Mackey, his client, the Sheriff's deputy and the Court's bailiff. And the time, from approximately 9:45 to 10:40, when we went back on the record, was consumed by having Mr. Mackey having the opportunity to meet with his client and to also view the videotapes which were referred to by Mr. Wise in regard to the matters which were taped at the Alliance Police Department with Detective Hilles and the Defendant and also the Defendant and Mr. Croley." Transcript Vol. II at 8-9.
 {¶ 47} Defense counsel then moved for a mistrial, which was denied by trial court. The trial court, in denying such motion, stated, in relevant part, as follows:
 {¶ 48} ". . . We now move to the mistrial motion in regard to the videotapes. As has been stated by the Court, the Court has given the counsel for the Defendant, with his client present, the opportunity to view the videotapes for approximately one hour this morning. And it's my understanding that the State was only made aware of the existence of these videotapes today when the Detectives that were subpoenaed came to the courthouse with the tapes.
 {¶ 49} "Is that correct, Mr. Wise?
 {¶ 50} "MR. WISE: Yes, Your Honor.
 {¶ 51} "THE COURT: And you made Mr. Mackey aware of the existence of those tapes as soon as you became aware of them; is that correct?
 {¶ 52} "MR. WISE: Yes, Your Honor.
 {¶ 53} "THE COURT: Very well. The Court will find that in regard to the tapes, that the opportunity to review the tapes has been given to counsel for the Defendant, with the Defendant present, and that the State of Ohio has completed its responsibilities in disclosing the existence of these tapes to the defense counsel as soon as the State became aware of them. And, therefore, the motion in regard to the mistrial on the tapes is also denied. And Mr. Mackey's objection to the Court's ruling is noted for the record." Transcript Vol. II at 18-19.
 {¶ 54} Based on the foregoing, we find that there was no willful failure by the State to disclose the videotapes and that, as noted by appellee, the trial court attempted to remedy "any disadvantage to the defense by allowing defense counsel, with Davis [appellant] present, approximately an hour to view the videotape." As noted by the trial court, the State disclosed the videotapes as soon as it became aware of the same. Furthermore, there is no evidence that appellant requested additional time to view the tapes. We find, therefore, that the trial court did not abuse its discretion in denying appellant's motion for a mistrial since such decision was not arbitrary, unconscionable or unreasonable.
 {¶ 55} Appellant's first assignment of error is, therefore, overruled.
 II {¶ 56} Appellant, in his second assignment of error, argues that the trial court erred in permitting hearsay testimony at trial. Appellant specifically asserts that the trial court erred in permitting Detective Bair to testify at trial about newspaper articles from the Alliance Review concerning ingredients and methods for producing methamphetamine and that the trial court erred in permitting Greg Croley to testify about ingredients used in such production "even though he claims no knowledge other than that obtained . . . from the Alliance Review."
 {¶ 57} Even assuming, arguendo, that such testimony was hearsay and was admitted in error, we find such error harmless. As is set forth in detail in the statement of facts, Detective Bair testified in detail, based upon his Drug Enforcement Agency training and his experience, concerning methamphetamine production and what ingredients are used in the same. Since testimony regarding methamphetamine production was, therefore, on the record, testimony about articles in the Alliance Review was harmless.
 {¶ 58} Appellant's second assignment of error is, therefore, overruled.
 III {¶ 59} Appellant, in his third assignment of error, contends that the trial court erred in overruling appellant's Crim.R. 29(A) motion for acquittal at the close of the State's case. We disagree.
 {¶ 60} Crim.R. 29(A) requires a trial court, upon motion of the defendant, to enter a judgment of acquittal of one or more offenses charged in an indictment if the evidence is insufficient to sustain a conviction of the offense or offenses. However, a trial court may not grant an acquittal by authority of Crim. R. 29(A) if the record demonstrates that reasonable minds can reach different conclusions as to whether each material element of a crime has been proven beyond a reasonable doubt. On appeal of the denial of a Crim. R. 29(A) motion, the "relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."State v. Williams, 74 Ohio St.3d 569, 576, 1996-Ohio-91, 660 N.E.2d 724, citing State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
 {¶ 61} Appellant was indicted for one count of illegal assembly or possession of chemicals for the manufacture of drugs in violation of R.C. 2925.04.1(A). Such section states as follows: "(A) No person shall knowingly assemble or possess one or more chemicals that may be used to manufacture a controlled substance in schedule I or II with the intent to manufacture a controlled substance in schedule I or II in violation of section 2925.04 of the Revised Code." R.C. 2925.04(A) states that "[n]o person shall knowingly . . . manufacture or otherwise engage in any part of the production of a controlled substance." Methamphetamine is a Schedule II controlled substance. See R.C. 3719.41.
 {¶ 62} At the trial in this matter, testimony was adduced that non-iodized salt, camping fuel and plastic tubing, all which are used in the production of methamphetamine, were found in appellant's truck. As is stated above, there was evidence that Epsom salt was found in the residence where appellant was staying and that a "gas generator" of the type used in methamphetamine production was located outside of the garage. Testimony also was adduced that appellant had smoked methamphetamine with Croley and Taylor and that Taylor saw appellant crushing up pills in a bowl and heard appellant saying that he was going to make a "batch" of methamphetamine. Croley previously had testified that he told appellant that he did not want anything illegal done in his house since he had several acquaintances who recently had been arrested for methamphetamine production. Both Taylor and Croley testified that, after their arrest, appellant told them that, if they remained quiet, the State could not prove its case.
 {¶ 63} Testimony also was adduced that while appellant denied knowledge of methamphetamine production, when he was questioned about the items found in his truck, appellant indicated that "it takes a lot more than that to make methamphetamine." Transcript Vol. II at 100.
 {¶ 64} Based on the foregoing, we find that there was sufficient evidence that appellant knowingly assembled or possessed one or more chemicals that may be used to manufacture a controlled substance in schedule I or II with the intent to manufacture a controlled substance in schedule I or II. The trial court, therefore, did not err in denying appellant's Crim. R. 29(A) motion for acquittal.
 {¶ 65} Appellant's third assignment of error is, therefore, overruled.
 IV {¶ 66} Appellant, in his fourth assignment of error, asserts that the trial court erred in overruling appellant's Motion to Dismiss. We disagree.
 {¶ 67} In the case sub judice, on May 7, 2003, appellant filed a Motion to Dismiss, arguing that R.C. 2925.04.1(A) "is void for vagueness and overbreadth in violation of the First and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution." Appellant specifically argued that the statute fails to give a person of ordinary intelligence fair notice of what conduct was prohibited and prohibits constitutionally protected conduct as well as unprotected conduct. Prior to the commencement of trial on May 14, 2003, the trial court denied such motion on the record.
 {¶ 68} We begin our analysis by acknowledging the basic premise that statutes are entitled to a strong presumption of constitutionality. Statev. Longhorn World Championship Rodeo, Inc. (1985), 19 Ohio App.3d 115,118, 483 N.E.2d 196. Thus, where possible, the courts should construe statutes in a manner which permits the statute to operate lawfully and constitutionally. Schneider, Tax Commr. v. Laffoon (1965), 4 Ohio St.2d 89,97, 212 N.E.2d 801.
 {¶ 69} A statute is unconstitutionally vague if men of common intelligence must necessarily guess at its meaning and differ as to its application. Connally v. General Construction Co. (1926), 269 U.S. 385,391, 46 S.Ct. 126. However, a statute is not unconstitutionally vague if it "* * * (1) provides sufficient notice of its proscriptions, and (2) contains reasonably clear guidelines to prevent official arbitrariness or discrimination in its enforcement." Perez v. Cleveland, 78 Ohio St.3d 376,378, 1997-Ohio-33, 678 N.E.2d 537, citing Smith v. Goguen (1974),415 U.S. 566, 94 S.Ct. 1242.
 {¶ 70} In the case sub judice, appellant specifically contends that R.C. 2925.04.1 is vague because "[n]o overt act of engaging in illegal activity need occur before an arrest can be made. One must simply have a plastic tube, some chicken wire or a can of camp stove fuel to be in apparent violation." As is stated above, R.C. 2925.04.1 states, in relevant part, as follows: "A) No person shall knowingly assemble or possess one or more chemicals that may be used to manufacture a controlled substance in schedule I or II with the intent to manufacture a controlled substance in schedule I or II in violation of section 2925.04 of the Revised Code." In turn, R.C. 2925.04 (A) makes it illegal for a person to "knowingly manufacture or otherwise engage in any part of the production of a controlled substance." We concur with appellee that the statute "requires an overt act, that is, some part of the possessing of chemicals for production" and that the statute puts appellant and individuals of common intelligence on notice that they cannot possess such chemicals if their intent is to produce drugs. We find, therefore, that the statute is not void for vagueness.
 {¶ 71} As is stated above, appellant also argues that R.C. 2925.04.1 is overbroad. A law may be unconstitutionally overbroad, "* * * if in its reach it prohibits constitutionally protected conduct." State v.Woodbridge, 153 Ohio App.3d 121, 125, 2003-Ohio-2931, 791 N.E.2d 1035, citing Akron v. Rowland, 67 Ohio St.3d 374, 387, 1993-Ohio-222,618 N.E.2d 138. Laws regulating or potentially regulating the exercise of constitutional rights must be narrowly tailored to address the specific legislative concern. Id., citing Painesville Bldg. Dept. v. Dworken Bernstein Co., L.P.A., 89 Ohio St.3d 564, 568, 2000-Ohio-488,733 N.E.2d 1152. A statute is narrowly tailored if it targets and eliminates no more than the exact source of the wrong it seeks to remedy. Id., citing State v. Burnett, 93 Ohio St.3d 419, 429,2001-Ohio-1581, 755 N.E.2d 857, citing Frisby v. Schultz (1988),487 U.S. 474, 485, 108 S.Ct. 2495. Accordingly, the overbreadth doctrine provides the breathing space that, "* * * First Amendment freedoms need * * * to survive." Id. at 125-126, citing Natl. Assn. for the Advancementof Colored People v. Button (1963), 371 U.S. 415, 433, 83 S.Ct. 328.
 {¶ 72} A party claiming that a piece of legislation is facially overbroad must demonstrate that it can be regularly and improperly applied to prohibit protected expression and activity. Id. at 126, citingHouston v. Hill (1987), 482 U.S. 451, 458, 107 S.Ct. 2502, 96 L.Ed.2d 398. Even where criminal statutes have a legitimate application they will be deemed facially overbroad where they render, "* * * unlawful a substantial amount of constitutionally protected conduct." Id. citingHouston at 459.
 {¶ 73} Appellant contends that the statute is overbroad because it "criminalizes conduct which is constitutionally protected activity" and because it "impermissibly infringes upon the First Amendment rights of free speech and association." Appellant argues that a person using a camp stove, going on a camping trip, or cooking outside could be found to have violated the statute, presumably as a result of his or her possession of camping fuel. However, the statute does not prohibit mere innocent possession of such an item or any other item. Rather, the statute prohibits possession of chemicals necessary to produce a schedule II drug with the intent to engage in any part of the production of a controlled substance. Mere possession, in and of itself, would not be sufficient. We find, therefore, that the statute is not overbroad.
 {¶ 74} Appellant's fourth assignment of error is, therefore, overruled.
 V {¶ 75} Appellant, in his fifth assignment of error, argues that the trial court erred by not requiring the State to provide appellant with the statements of Roberta Taylor and Greg Croley. Appellant claims that both Croley and Taylor are co-defendants and that, therefore, he was entitled to their grand jury testimony and statements recorded at the Alliance Police Department pursuant to Crim.R. 16(B)(1)(a)(i).
 {¶ 76} Criminal Rule 16 states, in pertinent part, as follows:
 {¶ 77} "B) Disclosure of evidence by the prosecuting attorney
 {¶ 78} "(1) Information subject to disclosure.
 {¶ 79} "(a) Statement of defendant or co-defendant. Upon motion of the defendant, the court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph any of the following which are available to, or within the possession, custody, or control of the state, the existence of which is known or by the exercise of due diligence may become known to the prosecuting attorney:
 {¶ 80} "(i) Relevant written or recorded statements made by the defendant or co-defendant, or copies thereof;"
 {¶ 81} The Ohio Supreme Court has defined "co-defendant" as " `[m]ore than one defendant being sued in the same litigation; or, more than one person charged in the same complaint or indictment with the same crime.'State v. Stojetz, 84 Ohio St.3d 452, 459, 1999-Ohio-464, 705 N.E.2d 329, citing State v. Wickline (1990), 50 Ohio St.3d 114, 118, 552 N.E.2d 913,918.
 {¶ 82} Appellant was the only person charged in the indictment in the instant matter. Therefore, Taylor and Croley were not co-defendants and thus mandatory disclosure of their statements under Crim.R. 16(B)(1)(a)(iii) is not required.[3]
 {¶ 83} Appellant's fifth assignment of error is, therefore, overruled.
 {¶ 84} Accordingly, the judgment of the Stark County Court of Common Pleas is affirmed.
Edwards, J., Hoffman, P.J. concurs separately, Boggins, J. concurs.
[1] R.C. 2925.04.1 is the same as R.C. 2925.041.
[2] Appellant was in the booking room from approximately 5:00 or 6:00 a.m. until around 1:00 or 1:30 p.m.
[3] We note that appellant does not argue that he had a "particularized need", pursuant to State v. Greer (1981), 66 Ohio St.2d 139,420 N.E.2d 982, for the grand jury testimony.